## W. M. HAMILTON v. THE STATE.

No. 21490. Delivered March 26, 1941.
Rehearing Denied May 14, 1941.

The opinion states the case.

*Robert D. Peterson,* of Marlin, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State, on submission.

GRAVES, Judge.

The appellant is charged with the voluntary killing of one Babe Gates, a negro woman, with his malice aforethought. The punishment assessed is confinement in the penitentiary for twenty-five years.

This is the second appeal in this case. The opinion delivered by this court on the former appeal is reported in (138 Texas Crim. Rep. 205) 135 S. W. (2d) 476, where the material facts constituting the offense are stated. Consequently, we deem it unnecessary to re-state the same here as there is no material difference in the facts proven on this trial and those proven at the former trial.

Upon this trial, as in the former trial, appellant filed a verified motion to quash the indictment on the ground of discrimination against the negro race, of which he is a member, in the appointment of jury commissioners and in the selection of grand and petit jurors, which, he asserts, was in violation of the Fourteenth Amendment to the Constitution of the United States. In support of this motion the present district judge testified, in substance, that he had held this office for about four years. At the time he appointed a jury commission to select a grand jury, he selected all white men, and that he had not named a negro on such commission during his tenure of office, and that upon a check back he did not find any negro as far back as 1936 on either commission or grand jury. The grand jury was selected out of sixteen names, all names placed in a hat and the slips drawn out and placed on the lists of the first twelve in the order drawn. He did not recall the name of any negro drawn on the grand jury. He appointed the jury commission who drew the grand jury that found the indictment against appellant. He knew of some negroes who might have made good commissioners. He gave that matter no thought at such time; he only tried to get three good men, and he instructed them not to discriminate at all in their selections; he gave them the poll 'list and the tax payers' list, and told them that negroes, when qualified otherwise, might serve on the jury, and not to discriminate between the races. Falls County's population is about 38,000, with about 12,000 or 15,000 negroes.

Mr. Depew, one of the jury commissioners, testified that he, Mr. Cousins and Mr. Gray were the three men appointed by Judge Dickens to select a grand jury and jurors for such term of court. He selected four grand jurors and seventy-two

petit jurors, and was personally acquainted with them all so selected. There were no negroes on this list. He didn't think he knew any negroes thus qualified. He did not discriminate against any person because he was of the negro race. "I tried to select men who were honest, fair and impartial. I do not know whether any names drawn by the other commissioners were negroes or not. I drew none."

Cuyler Cousins, another jury commissioner, testifed:

"We selected 16 names as grand jurors, as well as the petit jurors. I do not know whether the names I drew were negroes or not. There were some negroes' names drawn in the list. I do not know how many. I think I know some negroes who are qualified to serve as grand jurors. Judge Dickens told us to pick names for the jury list regardless of whether they were white or black, not to discriminate against the negro race, and I did not so discriminate. I did draw names whom I did not know whether they were white or black, and one or two negroes were drawn on the jury panel for this present term of court. I followed the poll and tax payers list in making my selections. I did not select any negroes for the grand jury panel. I imagine I know some negroes in this county who can read and write, of sober habits, sound judgment and honest. I did not discriminate against them on account of the fact that they were of the negro race."

Harold Gray, the third commissioner, testified:

"I might have selected some negroes on the jury panel. Some of them I did not know. I took the poll and tax payers lists and selected from them. I am not very well acquainted all over the county. I do not personally know any negroes that are qualified to sit on grand and petit juries. I didn't select any negroes that I know of myself. I selected a portion of our lists of jurors from my immediate vicinity. We did not discriminate against the negro race. Judge Dickens instructed us not to discriminate against the negroes, and we did not do so. I do not remember running across the names of any negro on my list. If I did I did not skip his name and fail to draw him because of his race. I took a section and each of the others took a section, and then we added them together."

Judge E. M. Dodson, District Judge prior to the present judge, testified:

"I was district judge from 1926 to 1934. I don't think I ever named any negro as jury commissioner during my tenure of office; there was one negro drawn on the grand jury panel but

he failed to qualify and was excused. There were negroes drawn on the petit jury panel, but I do not think any one of the negroes served; those who qualified were excused by the attorneys. I always instructed my commissioners to select good men who were best qualified under the law, whether they were white or black. I did not discriminate against the negroes when appointing the jury commissioners. I kept in mind the statute relative to such commissioners, that they be well qualified, outstanding men and citizens that know the people of the county. I never wilfully refused to select the name of a negro because of the fact he was a negro. I do not exactly remember how many negroes have served on juries under me, but I remember on a negro's trial, when he received the death penalty, there were several negroes on the jury venire, and from time to time there would be a negro juror on the panel; most of them were not able to qualify for some cause or other. I do not think I am able to pick any negro in the town of Marlin who would meet the statutory requirements for a jury commissioner. I think I know some in the county that could qualify."

G. H. Carter resided in Falls County, and practiced law there forty-two years. He had been a county official. He testified: "I recall a negro serving on the grand jury about 15 or 18 years ago. I do not remember any negro on any jury commission. I know of a number of negroes on the petit jury, 10 or 12 years ago. During that time I have seen negroes on jury panels, a year or two ago. I do not know of any jury commissioner discriminating against the negro race. I think I know some negroes qualified to serve as jury commissioners and as grand jurors. The county is about 40 per cent negroes in population."

Mr. Van Pelt, the district clerk, testified that there were no negroes on the grand jury during the six years he served as such clerk; there were some negroes drawn on the petit jury, but none finally served on the jury. He knew some negroes who were able to read and write and were of sober habits. He did not know what per cent of the negroes are thus qualified.

Judge Prentice Oltorf testified that he was district judge of this district for about eight years in 1918 to 1926. "I never appointed a negro jury commissioner while in office, and I do not now have any recollection whether a negro was drawn on the grand jury, or not, but I do not recall seeing one on such panel. There might have been one or two drawn but I am pretty sure none ever served, and I don't think any negro served on

the petit jury while I was in office. If they showed up they were either disqualified or excused; they didn't serve. I imagine a few negroes in this county could qualify as jury commissioners under the law, and I think a few could qualify as grand jurors, and a few scattered around who could qualify as petit jurors. I never did as district judge discriminate against the negro when selecting my jury commission. I just named the men. I didn't give that any thought. I just selected good men, and those I thought of were white men. I never instructed them at all relative to the different races. There were negroes drawn on the petit jury panel. I have no recollection of any on the grand juries. I don't remember whether the petit negro jurors were excused or just disqualified."

A. L. Hunter, presumtively a negro physician who lived in Marlin, testified: "I am well acquainted with the negroes in Falls County. I think there are about 10,000. I think about 50 per cent of these persons are able to read and write, and of sober habits. I have never heard of a negro serving either as jury commissioner or on a grand or petit jury in Falls County. I have never been called for service as such. I do not know how many negroes have been drawn for jury service; I do not know whether any negroes are drawn for jury service this present week. I cannot state of my own knowledge that the officers have willfully discriminated against the negro race in the selection of jurors. I do not know what the jury commission does. There are 5 or 6 negroes in Marlin who are practicing professions of different kinds. There are no other negro physicians in Falls County. There is one dentist in this county of the negro race."

Janie Belle Ray testified "I was district clerk of Falls County 7 years from 1931 to 1938. During my term of office I do not remember any negro serving on the grand or petit jury. There might have been one negro on the grand jury panel and some on the petit jury panel. I do not remember that any one of them ever served. I do not know of any officials ever discriminating against the negro race; the judge always told the commissioners to draw qualified jurors from the tax rolls. I do not recall any negro on the jury commission, nor grand jury; there have been numerous instances where negroes have been drawn to serve as petit jurymen. I don't know the reason they didn't serve."

Tom B. Bartlett, a practicing attorney for many years in Falls County, testified: "I never knew of any negro serving

as jury commissioner in this county, nor of one being selected as a member of the grand jury. About 10 or 11 years ago a negro served on the petit jury. I think there are 400 or 500 negroes qualified under the law to serve as jury commissioners and as grand and petit jurors. I understand there are two negroes on the jury panel for this week in this court. I do not know of my own knowledge of any discrimination against the negro in selecting the juries, nor of any judge who has instructed the commissioners to thus discriminate."

Charlie Wyman, a negro school teacher, testified:
"I have never heard of any negro having been selected as a member of the jury commission, grand juror or petit juror in Falls County; have lived in Marlin all my life. There are many negroes in Falls County who are owners of real estate, can read and write, and are of sober habits and good moral character. I do not know how many negroes have been drawn for jury service at this term of court."

A. J. Carter testified:
"I am a member of the jury panel to serve on the case under investigation now. I am summoned as a juror in the W. M. Hamilton case on the special venire; there is another negro, Oscar Webster, on this jury panel. I have never heard of any negro being called to serve as a jury commissioner in this county, nor of one to serve as a grand juror. I haven't been called as a grand juror."

Oscar Webster testified:
"I appear here today as a member of the special venire to try W. M. Hamilton; year before last I was called as a petit juror. I am a member of the colored race. I am 50 years old and can read and write the English language. I have not been called as a jury commissioner nor as a grand juror. I have never served as a petit juror. I have never heard of a negro being called as a commissioner or as a grand juror. I have heard of several being called as a petit juror. There is a large number of negroes who own property and are able to read and write and are of sober habits, honest and of sound judgment."

It is drawn from the foregoing statements that there has not been any negro jury commissioners selected by the district judges of this county for many years. It is also clear that in no instance did such district judge intentionally exclude from such appointment any negro because of the fact of his race. The selection of such commissioners seems to be a matter entirely within the discretion of the court, and appellant's com-

plaint is lodged not so much against their personnel but as to the fact that these commissioners failed to select negroes on the grand jury panel to be presented by them to the district court from which the grand jury was to be selected. The statute governing the selection by such commissioners of such grand jury panel is Art. 339, C. C. P., and reads as follows:

"No person shall be selected or serve as a grand juror who does not possess the following qualifications:

"1. He must be a citizen of the State, and of the county in which he is to serve, and qualified under the Constitution and laws to vote in said county; but, whenever it shall be made to appear to the court that the requisite number of jurors who have paid their poll taxes can not be found within the county, the court shall not regard the payment of poll taxes as a qualification for service as a juror.

"2. He must be a freeholder within the State, or a householder within the county.

"3. He must be of sound mind and good moral character.

"4. He must be able to read and write.

"5. He must not have been convicted of any felony.

"6. He must not be under indictment or other legal accusation for theft or of any felony. (Id., p. 78; O. C. 289; Const., art. 16, sec. 19; Acts 1903, 1st C. S. p. 16.)"

It will be noted that not every person who can read and write and is a householder in the county or a freeholder in the State, is a qualified grand juror. He must also be of sound mind and good moral character, never having been convicted of a felony, and not be under accusation for theft or a felony. Much of the determination of the fitness of a grand juror is left in the hands of the commissioner, especially the portion relating to the good moral character of the prospective juror.

We are not impressed with the strength of the testimony showing the absence of negroes on either the commission or jury panels at a time prior to the selection of the commissioners who selected the grand jury which found the indictment against appellant. What other prior commissioners or grand juries did in the past could not affect the act of the present grand jury in any of its actions. The question presented to us is whether in the action of this present grand jury of March, 1939, there has been shown any discriminatory action, either in their

selection or in their findings against appellant, because of the fact that he is a member of the colored race. What other judges, jury commissioners, or juries might have evidenced in the past, is not a matter that could affect the acts of the present grand jury and the commissioners that selected the same. What other bodies might have done in the past is neither persuasive of nor indicative of what these present bodies did in attempting to perform their statutory duties. The question that should concern us is: "Was *this* appellant discriminated against in the selection of a grand jury because of being a negro?"

We have heretofore held in Ryan v. State, 136 Texas Cr. R. 140, 123 S. W. (2d) 659, that the mere fact that for many years no negroes were drawn or served on grand juries would not alone show that an intentional discrimination was made against negroes because of race or color. To the same effect is the case of Ross v. State, 7 S. W. (2d) 1078, also Roberts v. State, 81 Texas Cr. R. 227, 195 S. W. 189; Pollard v. State, 58 Texas Cr. R. 299, 125 S. W. 390; Mitchell v. State, 105 Texas Cr. R. 297, 288 S. W. 224.

In the Ryan case, supra, and the same facts in Hines case, 123 S. W. (2d) 660, and the same facts in the Brown and Hunter cases, idem, 661, a writ of certiorari was denied by the United States Supreme Court in 59 S. Ct. 828, 307 U. S. 609, 83 L. Ed. 1493.

In this instant case it is shown that the district judge who selected these jury commissioners instructed them not to discriminate against any person because of race or color, but to select men as provided for under the statute. It is apparent that out of the men thus selected for a grand jury panel, in order to comply with the law, each commissioner should have been familiar with the characteristics of the men whom he selected for such a position. The mere fact that no negro was thus selected is not of itself a mark of discrimination. See the cases just above cited.

A further indication of the fairness of such jury commissioners is seen in the fact that they did actually select two members of the negro race as members of the jury venire before which appellant was arraigned for trial. The further testimony of these three commissioners that they did not discriminate against the colored race in their selection of jurors should have some weight in the determination of the question of discrimination. The statute, Art. 333, C. C. P., requires that these commissioners be intelligent citizens of the county, and

should take an oath providing, among other things, "that they would not knowingly elect any man as juryman whom they believe to be unfit and not qualified." And we are impressed with the conclusion that they fairly exercised their own judgment in thus observing their oaths as well as the court's instructions. If their testimony does thus show their fairness in discharging their duties, then we think the matter should be determined upon such facts as surround this instant indictment and not upon the course of procedure as evidenced by acts of former commissioners who had naught to do with the selection of the grand jury that found the indictment against this appellant. We think every tub should stand on its own bottom, and every indictment be judged by the grand jury that voted the same, and the commissioners who selected such body.

If it should be granted that a failure to select persons of the colored race upon prior juries or commissioners would be persuasive in matters relative to the failure to find any negroes on these jury panels, then we think the decisions of the Supreme Court of the United States, when reviewing such matters, should be persuasive to us as is evidenced by the following quotation from the opinion by Chief Justice Fuller in the case of Thomas v. Texas, 212 U. S. 278, 29 Sup. Ct. 393, 53 L. Ed. 512:

"It was ruled in Martin v. Texas, 200 U. S. 316, 50 L. ed. 497, 26 Sup. Ct. Rep. 338, as in other cases, that discrimination in organizing a grand jury and empaneling a petit jury cannot be established by merely proving that no one of the defendant's race was on either of the juries, and that an accused person cannot of right demand a mixed jury, some of which shall be of his race, nor is a jury of that kind guaranteed by the 14th Amendment to any race. And it was said: 'What an accused is entitled to demand, under the Constitution of the United States, is that, in organizing the grand jury, as well as in the empaneling of the petit jury, there shall be no exclusion of his race, and no discrimination against them, because of their race or color.'

"As before remarked, whether such discrimination was practiced in this case was a question of fact, and the determination of that question adversely to plaintiff in error by the trial court and by the court of criminal appeals was decisive, so far as this court is concerned, unless it could be held that these decisions constitute such abuse as amounted to an infraction of the Federal Constitution, which cannot be presumed, and

which there is no reason to hold on the record before us. On the contrary, the careful opinion of the court of criminal appeals, setting forth the evidence, justifies the conclusion of that court that the negro race was not intentionally or otherwise discriminated against in the selection of the grand and petit jurors. Indeed, there was a negro juror on the grand jury which indicted plaintiff in error, and there were negroes on the venire from which the jury which tried the case was drawn, although it happened that none of them were drawn out of the jury box. The court said:

" 'It may be that the jury commissioners did not give the negro race a full pro rata with the white race in the selection of the grand and petit jurors in this case; still this would not be evidence of discrimination. If they fairly and honestly endeavored to discharge their duty, and did not in fact discriminate against the negro race in the selection of the jury lists, then the Constitution of the United States has not been violated. We understand the rule to be that mere error in administering the criminal law of the state, or in the conduct of a criminal trial, no Federal right being invaded or denied, is beyond the revisory power of the Supreme Court of the United States under the Constitution and the statutes regulating its jurisdiction'."

We fear that the adoption of a rule that would require a pro rata representation between the white and colored races would result in an admixture of races to meet the possible objections of men of the different races that go to make up the melting pot from which comes the typical American citizen to such an extent that no trial court could give adequate representation to each race in the selection of either commissioners or jurors, and this would especially be so relative to criminal happenings that might take place between the selection of a grand jury list and the empaneling of such grand jury. To deliberately select persons of different races merely because of such difference might assume a discriminatory attitude in favor of such selected persons, and such suggested remedy would amount to a curative for a fancied evil by the use of another evil. We think this testimony shows an honest effort upon the parties charged therewith to follow out the method prescribed by law for the selection of fair and impartial men of sound mind and good moral character, and the fact that negroes were actually present on the petit jury selected by them should have weight in arriving at such conclusion. We there-

fore overrule bill No. 1 complaining of the trial court's failure to quash the indictment.

Bill of exceptions No. 2 complains because the witness Beckworth, while on the witness stand, volunteered the statement that while under arrest appellant showed the witness the gun that the State had introduced in evidence. It seems from the bill that this witness twice volunteered such statement, although the court had refused to admit such statement, and had admonished such witness not to so testify. It is noted that the witness Bobbie Bradley had already testified to the appellant having shown him such gun before any arrest had been made; it is also noted that regardless of the fact of an arrest. Art. 727, C. C. P. provides that under certain circumstances "the finding of * * * the instrument with which he (appellant) states the offense was committed" renders admissible a statement of the accused made while under arrest. It is also observed that the last paragrph of appellant's written confession introduced in evidence reads as follows: "When the gun went off, I dropped the gun and it fell down right behind the coonter, and I neverdid touch the gun again until (I) showed it to Mr. Beckworth later that night." We do not think there is any error reflected in said bill.

Appellant addressed quite a number of objections to the court's charge relative to the law of self-defense. His main contention seems to be that it is a limitation upon his right of self-defense. The court instructed the jury that if they believed from the evidence that immediately before the deceased was killed, she drew an ice pick or club or a pistol and made some movement with her hand or spoke some words which caused him to believe that she was about to stab him with the ice pick or hit him with a club or shoot him with a pistol which caused him to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation, etc., he killed the deceased; or if they had a reasonable doubt thereof, to acquit him. He contends that the court should have further instructed the jury that if the deceased was about to strike him with a pistol, etc., to acquit him. If the testimony had raised such an issue, it would have been proper for the court to have instructed the jury, but there is no evidence that the deceased had a pistol. Appellant, in his voluntary confession, stated that she (the deceased) came at him with an ice pick which he took away from her; that she then made a dash for a pistol which was under the counter but he beat her to it; that he undertook to throw the pistol over the counter

when it was accidentally discharged and killed her. It occurs to us that the court was rather liberal in his charge in that it gave appellant more than he was entitled to under the evidence. Hence the objection is without merit.

Bill of exceptions No. 4 reflects the following occurrence: The State called Bobbie Bradley, who testified to statements made by the defendant on the night in question. The witness was then turned over to appellant's counsel for cross-examination. Counsel excused the witness conditionally, stating in effect that the defendant wished to reserve the right to recall said witness for further cross-examination. On the following morning, but before the court had charged the jury, the defendant sought to recall Bobbie Bradley for the purpose of further cross-examination, to which the State objected. The court sustained the objection on the ground that he understood that both sides had announced that they had rested. Appellant contends that if he had been permitted to recall the witness for further cross-examination he (witness) would have stated that immediately after the killing appellant stated to the witness that at the time he drew a gun on the deceased she was coming on him with an ice pick in her hand.

Article 643, C. C. P., provides as follows:
"The court shall allow testimony to be introduced at any time before the argument of a cause is concluded, if it appear that it is necessary to a due administration of justice."

It will thus be seen that under the article above quoted, it is within the sound discretion of the court to permit the introduction of evidence before the argument closes, and such discretion will not be reviewed and reversed unless an abuse thereof is clearly shown. See Ford v. State, 97 Texas Cr. R. 55, 261 S. W. 141. We are not prepared to say that this bill shows such abuse of discretion by the court as requires a reversal of this case. See also McCann v. State, 129 Texas Cr. R. 105, 83 S. W. (2d) 967; Stanley v. State, 137 S. W. (2d) 34. It is shown by the qualification to said bill that the other witnesses were gone, the charge ready to be presented to the jury, and the court thought best not to delay the trial longer. It is also worthy of note that this desired witness had already been on the stand and had failed to give the testimony which it was claimed he would have given had be heen recalled. We quote from the last paragraph of this witness' testimony:

"As to whether or not Bill Hamilton told me about Babe Gates coming on him with a club, he didn't say she had any-

thing. He didn't tell me he took an ice pick or a club away from her, but he said she was coming on him."

This bill is overruled.

We do not think any error is evidenced by the record here presented, and the judgment is therefore affirmed.

### ON MOTION FOR REHEARING.

KRUEGER, Judge.

Appellant's motion for a rehearing is based upon four of the grounds which he urged for a reversal of the judgment upon the original submission of this case. The first is based on race discrimination in the selection of the grand jury, the third upon some claimed error in the court's charge, and the fourth upon the court's action in declining to permit appellant to recall a witness for further cross-examination. These complaints are fully discussed in our original opinion and we think they were properly disposed of. Therefore, we see no need for again entering upon an extended discussion thereof.

Appellant's second complaint is based upon the court's action in declining to sustain his motion for a mistrial and to enter an order accordingly because Mr. Beckworth, the arresting officer, while testifying, volunteered the statement that after he had placed appellant under arrest he showed him the pistol with which the alleged offense was committed. In his motion appellant contends that our decision of the question on this appeal. is in conflict with our opinion on the former appeal of this case. We are unable to agree with him. On the former appeal of this case, it was shown that the officer was permitted to testify not only that appellant showed him the pistol but to other statements made as to where he was and what he did at the time of the homicide, etc., and the State was then permitted to show by the arresting officer that appellant's statements were not and could not be true. There was no question about the identity of the pistol which caused the death of the deceased. There was testimony from other witnesses who appeared at the scene of the homicide before the officers arrested appellant who testified that appellant showed them the pistol and told them just how it happened that the pistol was discharged. It is obvious that the question now presented is quite different from that presented on the former appeal of his case.

The motion for rehearing is overruled.

The foregoing opinion of the Commission of Appeals has

been examined by the Judges of the Court of Criminal Appeals and approved by the Court.