# OCTOBER 7, 1942

HENRY ALLEN HILL V. THE STATE.

No. 21689. Delivered October 22, 1941.
Rehearing Denied January 7, 1942.
Appealed to United States Supreme Court.
Petition for Writ of Certiorari Granted by United States.
Supreme Court April 30, 1942.
Mandate of United States Supreme Court, reversing the judgment of the
Court of Criminal Appeals, filed July 2, 1942 in vacation.
Order of Court of Criminal Appeals, remanding cause to trial court for
further proceedings therein as may be consistent with the order and
opinion of the Supreme Court of the United States, filed
October 7, 1942.

The opinion states the case.

*Doss Hardin,* of Dallas, for appellant.

*Chas. A. Pippen,* Assistant District Attorney, of Dallas, and *Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

KRUEGER, Judge.

The conviction is for the offense of rape. The punishment assessed is death.

The record shows that on Saturday night, November 30, 1940, the prosecutrix and John S. Sanders were out riding in an automobile; that when they reached an underpass between Parkland Hospital and the football stadium in the City of Dallas they had to slow down the speed of their car to about fifteen miles per hour; that appellant jumped on the running board of their car, opened the door, hit Mr. Sanders on the head, jerked the switch key out of the car and told Sanders that if he did not let him have the girl he would blow his brains out. Mr. Sanders jumped from the car and ran around to the side thereof, where appellant was and a fight ensued. Appellant hit Sanders on the head with a rock, knocked him down and then caught the prosecutrix and began to pull off her clothes. Sanders again came to the woman's rescue but appellant again knocked him down with the rock, and while Sanders was lying on the ground unconscious, appellant jerked her clothes off until she was almost nude. He then knocked her down and by force had sexual intercourse with her. During all this time she was screaming for help and struggling with her assailant to prevent him from accomplishing his purpose, but without avail. About the time that appellant had accomplished

his purpose, Mr. and Mrs. Kearns, and Mr. and Mrs. Gardner came along in an automobile. Seeing and hearing what was going on, they stopped and got out of their car to render whatever assistance they could. Appellant hesitated for a moment and then left, but during the struggle Sanders had torn a pocket from appellant's coat which contained his discharge from the penitentiary. Appellant was arrested the next day just before noon and carried to the city hall where he was identified by both Sanders and the prosecutrix. He made a voluntary confession admitting the assault but denying that he succeeded in raping prosecutrix.

Appellant contends that the court, in the trial of the case, committed seven errors, each of which requires a reversal of the judgment. We will consider and dispose of them in the order in which they are presented.

His first contention is that the court erred in declining to sustain his motion to quash the indictment based on the ground of alleged race discrimination in the selection of the grand jury. It is averred in his motion that he was of African descent and belonged to the negro race; that the jury commissioners, in the selection of grand jurors, deliberately and designedly discriminated against the members of his race in that they intentionally declined to select any negroes as members of the grand jury which returned the indictment against him. When his motion was presented, the State contested the same and the court heard evidence on the subject. Mr. James O. Cherry, one of the jury commissioners who selected the grand jury, testified in substance as follows:

"In selecting the Grand Jury we selected what we thought were the best qualified men to serve. We discussed the best men available. I knew part of the Grand Jurors and the other Commissioners knew part of them and each one selected the men they knew personally to make up the Grand Jury. * * * We did not select a negro. I did not know of one that was qualified. I made no investigation or inquiry as to whether there was a negro in Dallas County qualified to serve. * * * The Judge gave us the instructions in regards to selecting the Grand Jury, but did not tell us to select a negro. * * * We discussed the selection of a negro on the Grand Jury, but I didn't know a negro, personally, who was qualified. * * * We did not arbitrarily discriminate against the negro race, and no one

expressed any prejudice against the negro race in selecting the Grand Jury."

Mr. O. W. Cox, another jury commissioner, testified in substance the same as did Mr. Cherry. He said they carried out the instructions of the court to get the best men available without respect to race, color or creed.

Mr. H. W. Whisenant testified that he assisted in making up the census rolls for Dallas County for the year 1940; that the approximate population for the county was 398,049.

Charles T. Brackins, a negro, testified that he was engaged in the insurance and bonding business; that he owned property in Dallas County and paid his poll tax; that he had never been called upon to serve on a grand jury nor did he know of any negro who had ever been called. C. R. Graggs, another negro, testified in substance as did Brackins.

Charles A. Pippen, testified that he had lived in Dallas County for 27 or 28 years; that he is now serving as Assistant District Attorney; that he had served as Judge of the Criminal District Court of Dallas County for a period of sixteen years, but never had a negro on the grand jury; that he always read the statutes to the jury commissioners; that there are certain qualifications a man must possess to become a grand juror; that is, he must be a man of good moral character, not under indictment, not previously convicted of a felony, must be a qualified voter, etc.

Appellant testified in substance that he was arrested for the offense of rape on December 1, 1940; that he requested the officers to let him go before the grand jury and talk to the grand jury commissioners about putting a negro on the grand jury; that he could read and write and said that the averments in his motion were true. He testified that he did not know whether or not he was in jail when the grand jury was empaneled; that he did not know when the grand jury was sworn in; that he asked the officers to take him before the grand jury when they were bringing him from the city hall; that he made no request to be taken before the grand jury after he was transferred from the city hall to the county jail.

The Assessor & Collector of Taxes for Dallas County testified that 58,000 white people and 8,000 negroes paid poll taxes in said county.

Robert Gregory, who was employed by the Dallas Express (a colored newspaper), testified that he had been in Dallas four months; during which time he made a survey of the colored population of Dallas County; that it was his opinion that there were 55,000 negroes, including men, women and children. However, he did not know how many men could read and write or how many were qualified to serve as grand jurors.

Mrs. Pearl Smith, District Clerk of Dallas County, testified that she had held that position since January 1, 1939; that she had never issued any summons for negroes to serve on the grand jury in the county so far as she knew.

It was admitted by the attorneys for the State and the defendant that the grand jury which indicted appellant was empaneled on the first Monday in October, 1940, for a period of three months and that the offense was committed something like sixty days after the grand jury had been in session. Consequently the grand jury was in session at the time this offense was committed by the appellant.

Article 339, C. C. P., provides as follows:

"No person shall be selected or serve as a grand juror who does not possess the following qualifications:

"1. He must be a citizen of the State, and of the county in which he is to serve, and qualified under the Constitution and laws to vote in said county; but, whenever it shall be made to appear to the court that the requisite number of jurors who have paid their poll taxes cannot be found within the county, the court shall not regard the payment of poll taxes as a qualification for service as a juror.

"2. He must be a freeholder within the State, or a householder within the county.

"3. He must be of sound mind and good moral character.

"4. He must be able to read and write.

"5. He must not have been convicted of any felony.

"6. He must not be under indictment or other legal accusation for theft or of any felony."

These mandatory provisions of the statute, which are not deemed to be unfair, must be observed by the jury commission in the selection of the prospective grand jurors, and unless a person possesses the required qualifications he is not a competent and qualified grand juror.

In filing his motion to quash the indictment, appellant assumed the burden of sustaining his allegations by proof. He attempted to do so by showing certain facts from which, as he claims, such a conclusion could be reasonably drawn. He showed that 58,000 white persons and 8,000 negroes paid poll taxes in Dallas County, but the record is silent as to how many of them were male and how many were female persons; nor is it shown how many of these male persons could read and write; nor how many of them were freeholders in the State or householders in the county. Appellant called two of the jury commissioners as witnesses, each of whom denied any intention of excluding negroes from grand-jury service. Both testified that each jury commissioner selected men from his community who were considered best suited and qualified to render the service imposed upon grand jurors by law. Moreover, it was agreed that the grand jury had been empaneled while appellant was still serving a sentence in the penitentiary and approximately sixty days before he committed the alleged offense. Hence, there could not have been any formed design or concerted action on the part of the jury commissioners to discriminate against him.

The trial court patiently heard all the testimony relative to the question presented and decided it adversely to the appellant's contention. We do not feel that under the evidence adduced upon the hearing thereof that we would be authorized or justified in setting aside the conclusion reached by the court on the facts as presented by the record. The question here presented has frequently been before this court. See Murphy v. State, 141 S. W. (2d) 634; Seals v. State, 139 S. W. (2d) 105; Hamilton v. State, 150 S. W. (2d) 395; King v. State, 152 S. W. (2d) 342. The Supreme Court of the United States has passed upon the question in several cases, particularly as far back as Thomas v. State of Texas, 212 U. S. 278; 53 L. Ed. 512; Martin v. State, 200 U. S. 316, and many other cases since that time. See also Mamaux v. United States, 264 Fed. Rep.

816; Beckett v. United States, 84 Fed. (2d) 731; Ruthenberg v. United States, 245 U. S. 480, 62 L. Ed. 414.

It appears that some members of the Bar of this State have, from some source, gathered the impression that when a negro is indicted by a grand jury composed wholly of white men, it is sufficient proof to show race discrimination regardless of any proof that any member of such race possessed the required statutory qualifications for grand jury service and consequently, he is entitled to have the indictment quashed. If that contention should be sustained, notwithstanding that negroes are citizens of the United States of America, then every person of Italian, Spanish, Russian, Mexican or German descent or any other race, although citizens of the United States, would have the same right and privilege. If we should so hold, then a party belonging to either of the races mentioned, who committed an offense against the laws of this State, could not legally be indicted by a grand jury until at some subsequent term of court a grand jury could be drawn and empaneled upon which was some member of his race. Such a holding would not only tend to delay the trial of criminal cases but abrogate the constitutional provision guaranteeing to one accused of crime a speedy public trial. Whether or not race discrimination was practiced by a jury commission in the selection of prospective grand jurors is an issue of fact and must be established by the testimony with some degree of certainty to overcome the prevailing presumption that officers in the discharge of their official duties complied with the law. That jury commissioners are officers of the court within the purview of the law seems not even to be the subject of debate. The controlling question is not whether a member of the negro race should have been selected and empaneled as a member of the grand jury which indicted appellant, but whether the absence of a member of the negro race upon the grand jury resulted alone by reason of any race discrimination having been practiced against members of that race because of the fact that they were negroes. Having reached the conclusion that no such discrimination is here shown, his contention is overruled. We have written quite at length on this subject in the case of King v. State, 152 S. W. (2d) 342, where we have definitely and clearly expressed our opinion on the subject under consideration, and without reiterating our conclusions here, we deem it sufficient to refer to that case.

Appellant next complains of the following remarks by the District Attorney in his opening argument to the jury:

"I say to you, gentlemen, that a snake crawls on his own belly but these human vultures crawl on the bellies of our helpless and defenseless women."

Appellant objected to the remark on the ground that it constituted unsworn testimony; that the same was not warranted by the facts and was highly inflammatory and prejudicial. This bill is qualified by the court who states in his qualification that he sustained appellant's objection and instructed the jury to disregard the same. Appellant contends, however, that notwithstanding the court's instruction, the remark was of such a prejudicial nature that it could not be effectively withdrawn and erased from the minds of the jury. We are not in accord with appellant's contention. In the first place, it is common knowledge that a snake crawls on his belly; and it is also commonly known that men who, by force, overcome the resistance of helpless women and commit rape, crawl on the bellies of such women. Hence, the argument was not, in our opinion, the giving of unsworn testimony but a reasonable deduction from facts commonly known. See Fowler v. State, 118 Tex. Cr. R. 424.

By Bill of Exception No. 3 appellant complains of the following remark by the Assistant District Attorney:

"I submit you to check his motive (meaning the District Attorney of Dallas County) against those of the man who sits by that negro (referring to defendant's counsel) with his money jingling in his pockets that he had been paid to defend him."

Appellant objected to the argument on the ground that it was giving unsworn testimony, was prejudicial and was not supported by the record. In his qualification of the bill the court states that counsel for defendant in his argument to the jury severely criticized Will Fritz, Inspector of Detectives, and also the District Attorney, claiming that he (the District Attorney) was trying to establish a record by giving defendant the death penalty; that counsel objected to the use of the words by the Assistant District Attorney relative to "money jingling in his pockets"; that the court promptly sustained the objection and would have instructed the jury not to consider said remarks had such a request been made. It seems from the qualification of the bill, which appellant accepted, that the remarks were invited by

appellant's counsel by attributing selfish motives to the District Attorney in the prosecution of the case. Appellant cannot complain of argument provoked or invited by the conduct of his own counsel. See Calloway v. State, 92 Tex. Cr. R. 506; Sinclair v. State, 35 Tex. Cr. R. 130, and cases there cited. See also Morris v. State, 84 Tex. Cr. R. 100. The case of Gatlin v. State, 20 S. W. (2d) 431, to which appellant cites us, was affirmed by this court and does not sustain his contention of reversible error.

Bill of Exception No. 4 complains of the following remarks by the District Attorney in his argument to the jury:

"Look into the past record of defendant and determine whether he is a liar or a truthful witness."

No ground of objection is stated in the bill. Hence, we are unable to determine upon what ground he objected. We think that the argument was not improper in view of the fact that appellant, who testified in his own behalf, denied the act of rape, but admitted that he had theretofore been convicted twice of automobile theft. This testimony was admissible for the purpose of affecting his credibility as a witness. Consequently, the remark complained of was justified by the record.

In 45 Tex. Jr., p. 113, sec. 251, it is said:

"For the purpose of discrediting the witness, on cross-examination he may be questioned to elicit the fact that he has been legally charged with, indicted for, or convicted of a felony or any offense involving moral turpitude; and the witness may be compelled to answer such questions."

See Wright v. State, 103 Tex. Cr. R. 534; Minor v. State, 105 Tex. Cr. R. 189.

Bills of Exception Nos. 5 and 6 complain of certain argument made by the District Attorney. Each bill is qualified by the court and the qualification clearly shows that the argument complained of was invited by appellant's counsel. It appears to us that appellant's counsel was of the opinion that he could taunt the District Attorney and that he would have to sit there with his mouth closed and hands crossed and not make any reply.

By Bill of Exception No. 7 appellant complains of the following question propounded to him on cross-examination by the District Attorney:

"You were headed for the thickets because you knew that you had raped a white woman, didn't you, Hill?"

There was testimony by a number of witnesses that when Mr. and Mrs. Kearns and Mr. and Mrs. Gardner stopped their car at the scene of the offense, appellant hesitated for a moment and then ran up the hill into the brush. Hence, the question was legitimate cross-examination.

Appellant also complains of the court's action in overruling his motion for a new trial based on the ground that the jury rendered an illegal verdict in that the verdict returned by the jury was one by only eleven of the jurors and not a unanimous verdict by all twelve of the jurors who constituted the jury. The court heard evidence on the question presented. It appears from the record that when the jury retired to consider their verdict, they first voted on the question of appellant's guilt. The result of this vote showed that all of the jurors voted "guilty." They next voted on the penalty and the result showed that eight were for death, two for life and two for 99 years' imprisonment. Then, the next morning, after some further discussion of the evidence, another vote was taken and the result of this vote showed ten for the death penalty and two for 99 years. After further discussion among themselves, they took another ballot which showed eleven for the death penalty and one for 99 years' confinement in the penitentiary. Mr. Shelley, one of the jurors, did not believe that the panties offered in evidence were those worn by the prosecutrix; that he thought they were too small for a woman of her size. Mr. Dawson, one of the jurors, took off his trunks and compared them with the size of the garment which the girl was supposed to have worn at the time of the assault. After the garment was examined and compared, Mr. Shelley did not indicate that he declined to impose the death penalty. They then took another vote. Each juror wrote on a slip of paper the penalty he wanted imposed on the defendant and dropped it into a hat. These ballots were then canvassed and the result showed that each juror voted for the death penalty. The verdict was accordingly written and signed by the foreman. Juror Shelly testified that on the question of guilt he voted "guilty" but he did not believe that the punishment should exceed five years'

confinement in the penitentiary; that they discussed the case until after twelve o'clock and then retired for the night without having arrived at a verdict; that some of the jurors remarked that they would stay there from then on if he did not agree with them. He further testified that he told the jurors that they would have to take the responsibility on themselves; that he did not write "death" on a piece of paper and hand it to the foreman. He claims that he never voted for the death penalty. However, this was denied by the other members of the jury. He claimed further that when they came into the court room with the verdict and took their seats in the jury box and after the verdict had been read, the court inquired of each juror if that was his verdict; that he (Shelley) did not say anything or nod his head. He did not protest or advise the court that it was not his verdict. Every other juror testified that Shelley did vote for the death penalty. We are not favorably impressed with appellant's contention. A juror cannot impeach his verdict by subsequently repudiating his act; nor will he, under the circumstances here disclosed, be permitted thereafter to say that it was not his verdict when, after being asked if that was his verdict, he did not by word or sign indicate otherwise.

In the case of Weatherford v. State, 31 Tex. Cr. R. 530, this court, speaking through Judge Simkins, said:

"Upon grounds of public policy, courts have almost universally agreed upon the rule that no affidavit, deposition, or other sworn statement of a juror, will be received to impeach a verdict, or to explain it, or to show on what grounds it was rendered * * * and the wisdom of the rule needs no argument to support it."

This rule has been re-affirmed in the following cases: Bacon v. State, 61 Tex. Cr. R. 206; Gonzales v. State, 90 Tex. Cr. R. 238. Moreover, the evidence relative to the question here presented raised a controverted issue which the court decided adversely to appellant.

Finding no reversible error in the record, the judgment of the trial court is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION FOR REHEARING.

GRAVES, Judge.

Appellant in his motion, in the main, merely reiterates the contentions originally presented herein, which are treated in the original opinion. However, he is much exercised relative to the statement therein that if followed out to its necessary conclusion as to the presence on the grand jury of a person of the same nationality as that of appellant, that such a practice would result in endless confusion, and oftentimes in a discrimination against the State and *in favor of* the appellant. He arbitrarily classifies the nationalities that inhabit these states of ours under the color line into red, yellow, black and white, and overlooks the fact that these broad distinction of colors have many and varied subdivisions within themselves that are inimical to each other, not only in their habits and characteristics but in their creeds, beliefs and associations. We find nothing in the Fourteenth Amendment relative to color or race or creed. These words are not mentioned therein. The portion thereof herein contended to have been violated reads as follows:

"* * * Nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

One of the latest definitions of what is a denial of "due process of law" is found in the case of Lisenba v. People of California, Vol. 86, L. Ed., p. 189, Adv. Sheets No. 3, in which the Supreme Court of the United States, speaking through Justice Roberts, said:

"As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevent a fair trial."

Under this definition, let us see whether the failure to have a person of the negro race on the grand jury that indicted appellant could have had any influence or effect upon his trial, leaving for the time being the question of a discrimination in the selection of the grand jury. The grand jury that indicted appellant for this offense had been drawn and organized about sixty days prior to the date of the commission of the alleged

offense. This offense herein complained of could not possibly have been known or been in contemplation at the time of the drawing of the grand jury by the commissioners, nor at the time of the grand jury being impaneled as such, and we are at a loss to see how such proceedings could have "unfairly infected this trial." True it is, there were no negroes on this grand jury, but it is also true that the jury commissioners stated in their testimony that they knew of no negroes that possessed the qualifications set forth in the statute relative to grand jurors, these statutorily demanded qualifications being set forth in the original opinion herein, and being Art. 339, C. C. P.

It should be evident from a perusal of this statute that of a necessity a jury commissioner should have some knowledge of the qualifications of a person selected as a grand juror in order to follow out the mandates thereof. They could not have fairly based their selection upon a grand juror with whose qualifications they had no acquaintance, and it is to be noted that they stated they did not know any negro who possessed such statutorily required qualifications.

There is also offered to us as a reason to show discrimination against appellant the fact that for many years there had been no negro selected by the jury commissioners of such county to serve on the grand jury in Dallas County, and therefore such failure alone was evidence of a discrinination in the present instance against appellant because of his color. We are not herein given the privilege of hearing from such prior jury commissioners; they were not utilized in this hearing; but we are in possession of the testimony of two present jury commissioners, and we are at a loss to perceive any error in the method that they pursued in the selection of the names of persons to be used as a grand jury. Shall it be said to be their duty to select persons with whose qualifications they are not familiar merely in order to see that some person of the negro race might have a representative in color upon a grand jury that might be called upon to return an indictment for an offense, possibly as in the instant case, not even as yet committed? If such be demanded, then what should the ratio be as between the white and colored races? If such be demanded of jury commissioners, would not such be a discrimination in appellant's favor, and surely such as is not required of such commissioners.

Again, we are unable to see how or in what manner the failure of commissioners to place negroes on previous grand juries throughout the years should raise so strong a presumption as to override the sworn statements of the jury commissioners who selected the grand jury in the present instance.

Reverting to Justice Roberts' definition of due process, we are interested in the proposition as to how the failure of the jury commissioners to place a negro on the grand jury in this instance could have "fatally infected the trial" of appellant. Could it be said with any degree of fairness that any grand jury, no matter what its complexion nor aggregate nationality, would have failed to be impressed with the testimony found in this record to such an extent as to say that this appellant should not have been presented in court for this alleged offense? If not, then the element of due process passes out of this case, there being no complaint relative to the petit jury that passed upon appellant's guilt. Unless their lack of due process affected the finding of the indictment to such an extent that one would not have been found, then there has been no failure of the due process of law. We think the proven facts clearly demonstrate the fact that the failure of the presence of negroes on the present grand jury was not the cause of the return of this indictment, but that a grand jury composed of any or all nationalities or colors would probably have acted in the same manner as was done in this instance.

Is it evident or even probable that the failure to present one or many negroes on the grand jury venire resulted in an unfair trial that culminated in this verdict of guilt? Had a negro been present on the grand jury, is it even probable that a different verdict than that of guilt would have ensued?

Under the laws of our State and those of the United States we think appellant has been accorded a fair trial, as the doctrine of fairness and justice appears to us.

We think the further questions presented to us in this motion have been properly decided in our originial opinion, to which views we still adhere. Thus believing, the motion is overruled.

430

ORDER.

HAWKINS, Presiding Judge.

The judgment of conviction was affirmed by the Court of Criminal Appeals of Texas on the 22d day of October, 1941, and appellant's motion for rehearing was overruled January 7, 1942.

Appellant made application to the Supreme Court of the United States for writ of certiorari, which was granted, and on June 1, 1942, the Supreme Court of the United States reversed the judgment of the Court of Criminal Appeals of Texas and remanded said cause for further proceedings not inconsistent with said order of the Supreme Court of the United States.

Therefore, in compliance with said order this cause is remanded to the trial court for further proceedings therein as may be consistent with the order and opinion of the Supreme Court of the United States.

Accompanying this order and made a part thereof is a certified copy of the mandate from the Supreme Court of the United States now on file as a part of the record in this cause.

This the 7th day of October, A. D. 1942.