## AKINS *v.* TEXAS.

No. 853.   Argued April 30, May 1, 1945.—Decided June 4, 1945.

*Messrs. A. S. Baskett* and *W. J. Durham* for petitioner.

*Benjamin T. Woodall,* Assistant Attorney General of Texas, with whom *Grover Sellers,* Attorney General, was on the brief, for respondent.

MR. JUSTICE REED delivered the opinion of the Court.

This certiorari brings here for review a judgment of the Criminal District Court of Dallas County, Texas, sentencing petitioner to execution on a jury verdict which found petitioner guilty of murder with malice and assessed the penalty at death.

Certiorari was sought to the Court of Criminal Appeals of the State of Texas, which had affirmed the judgment, on a petition which claimed discrimination on account of his race, against the petitioner, who is a Negro, under the equal protection and due process clauses of the Fourteenth Amendment of the Constitution of the United States.[1]

---

[1] Certiorari was allowed also for alleged denial of due process under the Fourteenth Amendment because of the manner in which the trial judge was designated to conduct the trial court. He acted by assignment of the presiding judge of the First Administrative Judicial District of Texas under General and Special Laws, 48th Leg. Reg. Sess., p. 25 (Vernon's Annotated Civil Statutes, Texas, Art. 200a, § 5) instead of by appointment by the Governor under § 28, Article 5, of the Constitution of Texas, to fill the vacancy caused by the death of the regularly chosen occupant.

The legality of the assignment depends upon the validity of the provisions of the state statute as tested by the Texas Constitution. The constitutional requirement is that vacancies in the office of judges shall be filled by the Governor. The Texas statute provided for assignment of other judges for the work of the court. This statute was interpreted by the Court of Criminal Appeals to provide merely for the functioning of courts under assigned judges, who did not qualify as successors to decedent judges, until the vacancy was filled by appointment or election. The court upheld the constitutionality of

Certiorari was allowed because of the importance in the administration of criminal justice of the alleged racial discrimination which was relied upon to support the claim of violation of constitutional rights. 324 U. S. 836. This discrimination was said to consist of an arbitrary and purposeful limitation by the Grand Jury Commissioners of the number of Negroes to one who was to be placed upon the grand jury panel of sixteen for the term of court at which the indictment against petitioner was found. This is petitioner's only complaint as to racial discrimination. No other errors in the proceedings are pointed out.

The Fourteenth Amendment forbids any discrimination against a race in the selection of a grand jury.[2] *Neal v. Delaware,* 103 U. S. 370, 394; *Pierre v. Louisiana,* 306 U. S. 354, 356; *Smith v. Texas,* 311 U. S. 128; *Hill v. Texas,* 316 U. S. 400. The burden is, of course, upon the defendant to establish the discrimination. *Tarrance v. Florida,* 188 U. S. 519, 520; *Martin v. Texas,* 200 U. S. 316; *Norris v. Alabama,* 294 U. S. 587, 590. An allegation of discriminatory practices in selecting a grand jury panel challenges an essential element of proper judicial procedure—the re-

---

the statute. *Pierson v. State,* 177 S. W. 2d 975; *Fuller v. State,* 180 S. W. 2d 361; *Jones v. State,* 181 S. W. 2d 75; *Brown v. State,* 181 S. W. 2d 93; *Akins v. State,* 182 S. W. 2d 723. Whether the state rule is expressed in constitution, statute or decision, or partly in one and partly in another, the state's power is to be viewed as a totality. In the absence of a violation of fundamental principle of justice, a state's determination is conclusive upon the federal courts as to the meaning of the state law, so far as any federal question is concerned. *Hebert v. Louisiana,* 272 U. S. 312, 316; *Gregg Dyeing Co. v. Query,* 286 U. S. 472, 479–80; *United Gas Co. v. Texas,* 303 U. S. 123, 141–42. We find no violation of any of petitioner's federal rights in Texas' decision upon the legality of the organization of the court which tried petitioner.

[2] Constitution, Fourteenth Amendment, § 1: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

quirement of fairness on the part of the judicial arm of government in dealing with persons charged with criminal offenses. It cannot lightly be concluded that officers of the courts disregard this accepted standard of justice.

The order overruling the motion to quash the indictment was made after evidence and without opinion. That motion set out the alleged purposeful limitation on racial representation which is pressed here. The Court of Criminal Appeals, however, without a written analysis of the testimony, said in an opinion that it failed "to find any evidence of discrimination. On the contrary, the evidence shows an effort on the part of the authorities to comply with the holding of this court and of the Supreme Court of the United States upon the question of discrimination." *Akins* v. *State,* 182 S. W. 723. This reference to the holdings of the state and federal courts was to *Akens* v. *State,* 145 Tex. Cr. R. 289, 167 S. W. 2d 758, which reversed a previous conviction of petitioner on the authority of *Hill* v. *Texas, supra.* Although this opinion of the Court of Criminal Appeals does not refer to proportional racial representation on juries, recent decisions of that court had previously disapproved that procedure. *Hamilton* v. *State,* 141 Tex. Cr. R. 614, 150 S. W. 2d 395, 400, r. c.; *Hill* v. *State,* 144 Tex. Cr. R. 415, 157 S. W. 2d 369, 373, l. c., reversed on other grounds, 316 U. S. 400. We think, therefore, that the conclusions of the state courts show that in their judgment there was no proven racial discrimination by limitation in this case. Otherwise there would have been a reversal by the Court of Criminal Appeals.

As will presently appear, the transcript of the evidence presents certain inconsistencies and conflicts of testimony in regard to limiting the number of Negroes on the grand jury. Therefore, the trier of fact who heard the witnesses in full and observed their demeanor on the stand has a better opportunity than a reviewing court to reach a correct conclusion as to the existence of that type of discrimination. While our duty, in reviewing a conviction upon

a complaint that the procedure through which it was obtained violates due process and equal protection under the Fourteenth Amendment, calls for our examination of evidence to determine for ourselves whether a federal constitutional right has been denied, expressly or in substance and effect, *Norris* v. *Alabama,* 294 U. S. 587, 589–90; *Smith* v. *Texas,* 311 U. S. 128, 130, we accord in that examination great respect to the conclusions of the state judiciary, *Pierre* v. *Louisiana,* 306 U. S. 354, 358. That respect leads us to accept the conclusion of the trier on disputed issues "unless it is so lacking in support in the evidence that to give it effect would work that fundamental unfairness which is at war with due process," *Lisenba* v. *California,* 314 U. S. 219, 238, or equal protection. Cf. *Ashcraft* v. *Tennessee,* 322 U. S. 143, 152, 153; *Malinski* v. *New York,* 324 U. S. 401, 404.

The regular statutory practice for the selection of grand jurors was followed in this case. Under the Texas statutes jury commissioners appointed by the judge of the trial court select a list of sixteen grand-jurymen from which list twelve are chosen as a grand jury. Texas Code of Criminal Procedure, Articles 333, 337. Qualifications for grand-jurymen are set out in Article 339.[3] The Commissioners

---

[3] Art. 339. "No person shall be selected or serve as a grand juror who does not possess the following qualifications:

"1. He must be a citizen of the State, and of the county in which he is to serve, and qualified under the Constitution and laws to vote in said county; but, whenever it shall be made to appear to the court that the requisite number of jurors who have paid their poll taxes can not be found within the county, the court shall not regard the payment of poll taxes as a qualification for service as a juror.

"2. He must be a freeholder within the State, or a householder within the county.

"3. He must be of sound mind and good moral character.

"4. He must be able to read and write.

"5. He must not have been convicted of any felony.

"6. He must not be under indictment or other legal accusation for theft or of any felony."

are instructed by the court as to their duties. Art. 366. This method of selection leaves a wide range of choice to the commissioners. Its validity, however, has been accepted by this Court. *Smith* v. *Texas,* 311 U. S. 128, 130. Petitioner does not attack it now. Its alternative would be a list composed of all eligibles within the trial court's jurisdiction and selection of the panel by lot.

Petitioner's sole objection to the grand jury is that the "commissioners deliberately, intentionally and purposely limited the number of the Negro race that should be selected on said grand jury panel to one member." Fairness in selection has never been held to require proportional representation of races upon a jury. *Virginia* v. *Rives,* 100 U. S. 313, 322–23; *Thomas* v. *Texas,* 212 U. S. 278, 282. Purposeful discrimination is not sustained by a showing that on a single grand jury the number of members of one race is less than that race's proportion of the eligible individuals. The number of our races and nationalities stands in the way of evolution of such a conception of due process or equal protection. Defendants under our criminal statutes are not entitled to demand representatives of their racial inheritance upon juries before whom they are tried. But such defendants are entitled to require that those who are trusted with jury selection shall not pursue a course of conduct which results in discrimination "in the selection of jurors on racial grounds." *Hill* v. *Texas, supra,* 404. Our directions that indictments be quashed when Negroes, although numerous in the community, were excluded from grand jury lists have been based on the theory that their continual exclusion indicated discrimination and not on the theory that racial groups must be recognized. *Norris* v. *Alabama, supra; Hill* v. *Texas, supra; Smith* v. *Texas, supra.* The mere fact of inequality in the number selected does not in itself show discrimination. A purpose to discriminate must be present which may be proven by systematic

exclusion of eligible jurymen of the proscribed race or by unequal application of the law to such an extent as to show intentional discrimination. Cf. *Snowden* v. *Hughes*, 321 U. S. 1, 8. Any such discrimination which affects an accused will make his conviction unlawful.

The history and record of this case gives evidence that the courts of Texas which are charged with the trial of petitioner endeavored to comply with the federal constitutional requirements as to the selection of grand juries, according to the interpretation of this Court in *Hill* v. *Texas, supra*. Not only did the Court of Criminal Appeals reverse a former conviction of petitioner on its authority but the judge, now deceased, of the criminal district court of Dallas instructed the three jury commissioners, who selected this grand jury list, as testified to by each of them, that there should be no discrimination against anyone because of his color.[4]

---

[4] Commissioner Wells: "In the selection of our panel of sixteen for the grand jury the way we determined whom we would put on that list was, we were advised by Judge Grover Adams that the Supreme Court had ruled that we could not discriminate against any one because of his color, as I recall, they had not been discriminating for selection on the grand jury panel; and in turn they said there were sixteen, and it would be further evident if we placed one among the twelve so as to make it clear."

Commissioner Tennant: "When the grand jury commissioners were appointed by Judge Adams the only thing I remember he said is that we could not discriminate against the negro population being represented on the grand jury. No, he just outlined if he could qualify as a grand juror. In this particular instance we selected one negro on this panel; so far as I am concerned, I read in the paper that the Supreme Court of the United States stated that a negro could sit on the grand jury. . . . Judge Adams never mentioned to us about putting one negro on the grand jury, or five or ten. Yes, that there must be representation for the race."

Commissioner Douglas: "At that time Judge Adams, the judge of this court made some reference or instructions about how to select the grand jury. He thought it well to select negroes on the grand jury. He said he thought it would be well to select a negro on the

*Hill* v. *Texas, supra,* was decided June 1, 1942. The trial court has four terms a year—January, April, July and October. After the *Hill* decision, the jury commissioners who were appointed at the July 1942 term to select grand jurors for the October 1942 term, Texas Code of Criminal Procedure, Arts. 333 and 338, placed a Negro on the grand jury list although he did not serve. Under the instructions of the judge as just detailed, the commissioners for the January 1943 term, at which petitioner was indicted, placed a Negro on the list and he served as a grand juror. Prior to the decision in the *Hill* case, it does not appear that any colored person had ever served on a grand jury in Dallas County.

On the precise act of discrimination by the jury commissioners which is asserted by petitioner, that is the deliberate, intentional and purposeful limitation to one of the number of Negroes on the grand jury panel, the record shows as follows. About fifteen and one-half per cent of the population of Dallas County, Texas, is negro. A substantial percentage of them are qualified to serve as grand jurors. No exact comparison can be made between the white and negro citizens as to the percentage of each race which is eligible. On the strictly mathematical basis of population, a grand jury of twelve would have 1.8552 negro members on the average. Of course, the qualifications for grand jury service, note 3 *supra,* would affect the proportion of eligibles from the two races. As one member of the Negro race served upon the grand jury which indicted petitioner and one had appeared upon the other grand jury list which had been selected after the decision in *Hill* v. *Texas,* we cannot say that the omission from each of the two lists of all but one of the members of a race

grand jury. There was no further discussion about that. We did select a negro on the grand jury. All three of us went out there to see him. We all went and talked to just one negro and that is the one we selected."

406

which composed some fifteen per cent of the population alone proved racial discrimination.

In connection with that fact of omission, we must appraise the testimony offered to show the intentional limitation. Besides the language quoted in note 4 *supra,* which relates particularly to the court's instructions, other relevant evidence of such intention is found only in the testimony of the commissioners. They made these statements as to their intentions:

Commissioner Wells: "There was nothing said about the number and nothing was said about the number on the panel. . . . We had no intention of placing more than one negro on the panel. When we did that we had finished with the negro. That was the suggestion of the others and what Judge Adams thought about the selection of the grand jury. . . . Judge Adams did not tell us to put one negro or five negroes on the grand jury. Yes, we just understood to see that negroes had representation on the grand jury, and we went out to see this particular one because we did not know him. . . . Among the white people whose names might go on the grand jury, unless I knew them personally and knew their qualifications, we went out and talked to them. No, we did not discriminate against a white man or a negro. I attempted not to."

Commissioner Tennant: "We three did not go to see any other negroes, that is the only one. I did not have any intention of putting more than one on the list; I could not think of anybody; I would have if I could have thought of another one, and putting one on."

Commissioner Douglas: "Yes, sir, there were other negroes' names mentioned besides the one we selected; we did not go talk to them; we liked this one, and our intentions were to get just one negro on the grand jury; that is right. No, I did not have any intention of placing more than one negro on the grand jury. . . . We never agreed to select any certain number, but when we found one with all the

> qualifications of a grand juror we felt like that was satisfactory representation. . . . No, sir, we did not have in mind to put any set number of representatives of the various races. . . . We did not agree to put eleven negroes and one white man on, no. That is right, all that we were endeavoring to get a fair and impartial grand jury without any discrimination against any race on earth. We did not have in mind, or the other commissioners, to put any set number on of any race, white, yellow or what-not."

A careful examination of these statements in connection with all the other evidence leaves us unconvinced that the commissioners deliberately and intentionally limited the number of Negroes on the grand jury list. The judge who heard the witnesses on the motion to quash did not find that type of discrimination. The law of their state, the instructions of the judge, their oath of office required them to choose prospective jurors on their statutory qualifications and without regard to their color or the number of representatives of various races who might appear upon the list. We cannot say the commissioners violated these obligations.

This conclusion makes it unnecessary to decide whether a purposeful limitation of jurors by race to the approximate proportion that the eligible jurymen of the race so limited bears to the total eligibles is invalid under the Fourteenth Amendment.

The judgment is

*Affirmed.*

MR. JUSTICE RUTLEDGE concurs in the result.

The CHIEF JUSTICE and MR. JUSTICE BLACK dissent.

MR. JUSTICE MURPHY, dissenting.

The equal protection clause of the Fourteenth Amendment entitles every person, whose life, liberty or property is in issue, to the benefits of grand and petit juries chosen

without regard to race, color or creed. This constitutional principle is a fundamental tenet of the American faith in the jury system. The absence of such a principle would give free rein to those who wittingly or otherwise act to undermine the very foundations of this system and would make juries ready weapons for officials to oppress those accused individuals who by chance are numbered among unpopular or inarticulate minorities.

The State of Texas in this instance appears to have made a sincere effort to obey this constitutional mandate in selecting the grand jury which indicted the Negro petitioner. Until this Court's decision in 1942 in *Hill* v. *Texas,* 316 U. S. 400, no Negro ever served on a grand jury in Dallas County, Texas, where this case arose. In an attempt to comply with that decision the three jury commissioners were careful here to appoint one Negro to the sixteen-member grand jury panel; he qualified and served on the twelve-man jury. Thus it cannot be said that Texas has systematically and completely excluded Negroes from the grand jury. Cf. *Norris* v. *Alabama,* 294 U. S. 587; *Pierre* v. *Louisiana,* 306 U. S. 354; *Smith* v. *Texas,* 311 U. S. 128; *Hill* v. *Texas, supra.* But that fact alone does not guarantee compliance with the Fourteenth Amendment, however commendable may be the attempt. Racial limitation no less than racial exclusion in the formation of juries is an evil condemned by the equal protection clause. "The Amendment nullifies sophisticated as well as simple-minded modes of discrimination." *Lane* v. *Wilson,* 307 U. S. 268, 275. This case must therefore be reviewed with that in mind.

Petitioner, as a Negro, "cannot claim, as matter of right, that his race shall have a representation on the jury," *Neal* v. *Delaware,* 103 U. S. 370, 394, inasmuch as "a mixed jury in a particular case is not essential to the equal protection of the laws," *Virginia* v. *Rives,* 100 U. S. 313, 323. But petitioner, as a human being endowed with all the

rights specified in the Constitution, can claim that no racial or religious exclusion, limitation or other form of discrimination shall enter into the selection of any jury which indicts or tries him.

It follows that the State of Texas, in insisting upon one Negro representative on the grand jury panel, has respected no right belonging to petitioner. On the contrary, to the extent that this insistence amounts to a definite limitation of Negro grand jurors, a clear constitutional right has been directly invaded. The equal protection clause guarantees petitioner not only the right to have Negroes considered as prospective veniremen but also the right to have them considered without numerical or proportional limitation. If a jury is to be fairly chosen from a cross section of the community it must be done without limiting the number of persons of a particular color, racial background or faith—all of which are irrelevant factors in setting qualifications for jury service. This may in a particular instance result in the selection of one, six, twelve or even no Negroes on a jury panel. The important point, however, is that the selections must in no way be limited or restricted by such irrelevant factors.

In this case the State of Texas has candidly admitted before us "that none of the three [jury commissioners] intended to place more than one Negro upon the grand jury drawn by them." Commissioner Wells testified that "We had no intention of placing more than one Negro on the panel. When we did that we had finished with the Negro." In the words of Commissioner Tennant, "We three did not go to see any other Negroes, that is the only one. I did not have any intention of putting more than one on the list." Finally, as Commissioner Douglas stated, "Yes, sir, there were other Negroes' names mentioned besides the one we selected; we did not go talk to them; we liked this one, and our intentions were to get just one Negro on the grand jury; that is right. No, I

did not have any intention of placing more than one Negro on the grand jury."

Clearer proof of intentional and deliberate limitation on the basis of color would be difficult to produce. The commissioners' declarations that they did not intend to discriminate and their other inconsistent statements cited by the Court fade into insignificance beside the admitted and obvious fact that they intended to and did limit the number of Negroes on the jury panel. By limiting the number to one they thereby excluded the possibility that two or more Negroes might be among the persons qualified to serve. All those except the one Negro were required to be of white color. At the same time, by insisting upon one Negro, they foreclosed the possibility of choosing sixteen white men on the panel. They refused, in brief, to disregard the factor of color in selecting the jury personnel. To that extent they have disregarded petitioner's right to the equal protection of the laws. To that extent they have ignored the ideals of the jury system. Our affirmance of this judgment thus tarnishes the fact that we of this nation are one people undivided in ability or freedom by differences in race, color or creed.