UNITED STATES v. FOREST et al.
No. 27236.

United States District Court
E. D. Missouri, E. D.
Jan. 22, 1954.

· Harry Richards, U. S. Atty., L. E. Broome & B. Franklin Taylor, Jr., Sp. Assts. to Atty. Gen., and William D. English, St. Louis, Mo., for plaintiff.

Sydney L. Berger, Evansville, Ind. and R. L. Witherspoon, St. Louis, Mo., for Wm. Sentner.

Mary Kaufman, New York City, for Dorothy Rose Forest and Robert Manewitz.

James Frederick Forest and Marcus Al Murphy, appearing in their own behalf.

HARPER, Judge.

The defendants' challenge to the array and motion to quash the venire and jury list and to dismiss the petit panels drawn therefrom for the trial is based on the contentions that the jury officials (1) intentionally and systematically limited the representation of manual workers to a mere token representation; (2) intentionally and systematically limited the representation of negroes on the jury list; (3) disregarded their affirmative duty to employ methods that would obtain a cross-section of the community; and, (4) have drawn a panel for this case, the composition of which is such as to deny defendants a fair and impartial trial.

To support their contentions, the defendants filed an offer of proof based upon an analysis of the jury panels drawn in this court for the past five years; an analysis of information taken from questionnaires relating to the cards of the prospective jurors in the jury wheel when the panel for this case was drawn, and questionnaires of prospective jurors who were excluded from the jury wheel during the years 1952 and 1953; an analysis of information taken from the jury panel drawn for the case; certain data and publications of the Bureau of Census with respect to 1950; an affidavit of William P. Gruner, Federal Jury Commissioner for this district; an affidavit of James J. O'Connor, Clerk of this court; an affidavit of William Sentner, one of the defendants; and the testimony of James J. O'Connor, Clerk of this court.

The government stipulated as to the accuracy of the information contained on the work sheets from which the various analyses were made, with the exception of the designation of census classification, and limited their proof to the offer of supplemental affidavits by William P. Gruner, Federal Jury Commissioner for this district, and James J. O'Connor, Clerk of this court.

The law is well settled that before a jury panel can be quashed on the grounds of the exclusion of a race or group, there must be intentional and systematic exclusion, and such facts must be clearly shown. Frazier v. U. S., 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187; Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043; and Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181.

The question before the court is, therefore, one of fact as to whether

there is any basis for the contentions of the defendants.

The defendants did not produce any evidence as to who prepared the charts which purport to analyze the prior jury panels, the panel drawn for this case and the questionnaires of prospective jurors in the jury wheel on December 21, 1953, when the last panel for this case was drawn, and the questionnaires for prospective jurors whose names were excluded from the wheel during the years 1952 and 1953. So the value of these charts to determine the facts in this case are at most questionable. In view of the government stipulation, the charts with respect to the analysis of various data other than the occupation of the jurors and prospective jurors are of great value, but insofar as these charts pertain to the occupation of those individuals, it is very questionable, to say the least, that they are of any value at all. It is these charts which reflect the occupation of the individuals that form the sole basis for the defendants' first attack on the panel. No effort was made to classify these individuals according to religion, social, political or geographic status, but they are only classified as to occupation. The defendants in their arguments with respect to the motion stated that they were not concerned with an analysis of the persons involved with respect to their economic status, but were relying entirely upon the classification of individuals by their occupations, and such classification upon which they rely was based upon a classification system used by the Bureau of Census in its 1950 census taking. Such classifications are inevitably arbitrary, and they do not conform in this instance to the system of census classification used since before this classification is used by the Census Bureau much additional information is available to the Census Bureau with respect to the individuals that was not available information from which the charts in this case were made.

In addition, as stated above, the classification in this instance was made by some unknown person or persons whose qualifications to make such, even on the limited information available to them, is unknown to this court.

The twelve general classes of the 1950 census used in making the charts break the population as follows: Professional, technical and kindred workers; farmers and farm managers; managers, officials and proprietors, except farm; clerical and kindred workers; sales workers; craftsmen, foreman and kindred workers; operative and kindred workers; private household workers; service workers, except private household; farm laborers, unpaid family workers; farm laborers except unpaid and farm foreman; laborers except farm and mine; and occupations not reported.

An examination of the defendants' exhibits consisting of the Bureau of Census publications which were used to obtain the above categories and to obtain additional information is very enlightening. It discloses that in the various classifications used, in most instances there are many occupations listed that fall under the particular classification. To accept this breakdown as a reasonable classification as to economic status would compel the conclusion that everyone listed under, for example, the so-called managerial group, had the same viewpoint and mental attitude toward life as every other one. It would compel the court to say that railroad and Pullman conductors, floor walkers in stores, building superintendents, tug boat captains, such civil servants as elevator inspectors, jailers and morgue keepers, union officials and organizers, officials of various types of organizations, including political parties, and a great variety of managers and proprietors, regardless of whether they run a one-man business or a multi-million dollar corporation, had the same viewpoint and mental attitude toward life. The same application is true with respect to so-called manual workers, for we find there included such diverse types of workers as the most highly skilled machinist and millwright, unskilled car washers or grave diggers,

welders, hospital attendants, carpenters and bootblacks.

These same Bureau of Census pamphlets further disclose that in the St. Louis metropolitan area wherein a substantial part of the citizens of this division of the district reside, that of the males in the experienced civilian labor force at the time of the 1950 census, 18% of the managers, officials and proprietors except farm, had less than a $2,500 total income in 1949, while on the other hand, 18% of the craftsmen, farm and kindred workers had at least a $4,500 income in 1949.

The above admirably illustrates the impossibility of applying this breakdown as a reasonable and rational one for other than census purposes and could be of little, if any, help in the problem presented this court with respect to the challenge to this jury panel. The analysis, however, of the individuals involved, even on this unsatisfactory and distorted basis, refutes the claims of the defendants, for the charts prepared on such basis disclose that many more than a mere token representation of manual workers were included.

■ The testimony worthy of belief is convincing that the officials who are in charge of securing jurors did not intentionally and systematically limit or exclude the representation of any occupation group, or limit the representation to mere token numbers. The testimony of James J. O'Connor, the Clerk of this court, his affidavit and supplemental affidavit, and the affidavit and supplemental affidavit of William P. Gruner, the jury commissioner, show that they obtained the names of prospective jurors from the following sources: Clerks of the circuit and county courts, circuit judges, superintendents of public schools, chief highway engineers, probate judges, postmasters, court reporters, personal friends and acquaintances, former jurors, Negro ministers, Negro newspaper men, University Club roster, members of the St. Louis Chamber of Commerce (firms), and bank employees.

The letter sent by the jury commissioner to the members of the St. Louis *Chamber of Commerce* is very informative as to the care used in seeking the names of prospective jurors. I especially refer to that paragraph which reads as follows: "I would deem it a great favor if you would send me the names of —men and women of your organization, either active or retried, but in good health, who could serve. A cross-section of your employees would be admirable." This letter went to many firms that employ thousands of people.

In addition to the above sources within the last year, in excess of 200 names of prospective negro jurors were obtained from the records of the Election Board in the city of St. Louis. The jury commissioner swore that he had made an effort to obtain the names of members of labor unions, but with scant success, since the persons requested to furnish such names whom the commissioner knew as former members of labor unions, uniformly refused to comply with his request, and stated that it would be unfair to ask any such person to serve. The affidavits of both the jury commissioner and the clerk, and the clerk's testimony, emphatically deny the barring of anyone as prospective jurors because of color, creed, type of occupation or for any other reason, but on the contrary sought to secure qualified men and women wherever available. The sources of the names secured for prospective jurors and the instructions given to the people solicited for such names, demonstrate clearly the falsity of the defendants' accusation.

A perusal of the prospective jurors in the wheel, questionnaires of the rejected prospective jurors for 1952 and 1953, the panels for the past five years and the panels drawn for this case, clearly show that the efforts of the jury commissioner and the clerk produced a fairly representative cross-section of the citizens of this division of the district, and conclusively show that the testimony of the clerk of this court and his affidavits, and the affidavits of the jury

commissioner, are worthy of belief, and completely support it, and leads one to the conclusion that the charts prepared with respect to these individuals based upon the considered classifications are very misleading and of little help.

The record shows that an effort was made to obtain all types of occupations, including those who are categorically referred to in the classification as manual workers, that individuals falling into those categories were obtained, that the numbers obtained were much more than a token representation of manual workers, and that there is no reliable proof in this regard to support the defendants' first contention.

Nothing could be more absurd with respect to the system employed in this district than the accusation of the defendants with respect to their second contention that there was intentional and systematic limitation of the representation of Negroes on the jury list. The charts which the defendants produced conclusively show the absurdity of this contention. These charts show that 11.-35% of the population of this division of the district between the ages of 21 and 64 are Negroes, that of the names of jurors in the jury wheel from this division of the district when the panel was drawn, 9.2% were Negroes and 1.1% were of uncertian race, which probably meant that all or substantially all of them were Negroes, or that approximately 10.3% of the names of prospective jurors in the jury wheel at the time the panel was drawn for this case were Negroes.

Of the panel drawn for this case, 9.1% of the panel, or 15 out of 165, are Negroes, and the race of three others, or 1.3% cannot be determined until the jury reports.

The figures further show that with respect to the 897 rejected prospective jurors for this division of the district for the years 1952 and 1953, that 9.4% of these are Negroes, and 1.6% the race cannot be determined from the questionnaires. From past experience in this court, the court is of the opinion that practically all of those whose race cannot be determined, are Negroes. The figures with respect to persons between the age of 21 and 64 who have at least five years of education for residents of the city of St. Louis where a large percentage of the Negroes of this division of the district reside, show 95.3% of the white people have such education and 83.4% of the Negroes have such education. If this is any criteria, certainly no larger percentage of prospective jurors of the Negro race would qualify to be placed in the jury wheel when screened than of the white race. It might even lead one to suppose there would be a greater difference than the one that exists as illustrated by the percentages given above. Unmindful of the above figures, the defendants seek to use percentages for the past five years, when approximately 4% of the panels were Negroes, and this percentage refutes completely the defendants' contention.

The testimony conclusively discloses that with respect to Negro jurors the jury commissioner and the clerk had had trouble in obtaining names. They had used the word "Negro" on certain information that they obtained and on certain information that they prepared with respect to the jury system in an effort to insure the obtaining of a representative list of Negroes. The defendants criticize this system, and while the clerk and commissioner have made some changes with respect to it recently, it was not in an effort on the part of the clerk and the commissioner to exclude Negroes from the wheel, but a deliberate effort on their part to obtain the names of Negroes to put into the wheel. The criticism is without merit.

In the spring of 1953, the clerk and the jury commissioner began to obtain Negro names from the records of the election commission or the voters registration list of St. Louis. For a substantial part of the district and of this division of the district, there are no such records, but in the metropolitan area of St. Louis there are such. From this source in excess of 200 Negro names were obtained in 1953, questionnaires mailed to them, and the return questionnaires screened,

and the ones deemed eligible placed into the jury wheel. This practice started many months before this case was set finally for trial, and the jury commissioner and the clerk stated they intended to continue this practice. In spite of the percentages outlined above, the attack is made on this jury panel that the representation of Negroes was intentionally and systematically limited.

Unmindful of the above figures, the defendants attempted to adduce direct evidence of a deliberate intention to exclude Negroes on the part of the clerk and jury commissioner by questioning the clerk about certain questionnaires of prospective jurors who were Negroes which were excluded from the wheel during the years 1952 and 1953. A limited number of such instances for no apparent reason which the clerk testified were mistakes inadvertently made were shown. The government demonstrated in cross-examination of the clerk that the same type of thing occurred with respect to the questionnaires of people who had indicated they were white. The clerk and jury commissioner both swore they never barred anyone from jury service by reason of his color, creed or type of occupation. It is apparent that mistakes were made, but the figures conclusively show they were equally applicable to all races, colors, creeds and occupations. Several thousands of questionnaires have been screened to obtain the names that now remain in the wheel. In the year 1953, 1,810 were screened up to December 21. Only a minimum of mistakes were called to the clerk's attention when he was on the stand, yet the defendants would have this court over a minimum of honest mistakes applicable alike to all races, color, creed and occupations, believe that such mistakes were deliberate as they applied to Negroes, and quash the panel. This is in the face of testimony worthy of belief that such was not done, in the face of testimony that discloses that the same approximate percentage of all races were among the questionnaires of the prospective jurors for 1952 and 1953 which were not placed in the wheel and those that were placed in the wheel, and in the face of figures which disclose without question that the clerk and commissioner placed into the wheel a representative group of prospective Negro jurors.

■ The attempt to attack this panel because of purported intentional and systematic limitation of the representation of Negroes on the jury list is without the slightest foundation.

■ With respect to the defendants' third contention, the methods employed by the jury commissioner and the clerk in securing the names of prospective jurors has been discussed in detail, and this in itself negatives the defendants' third contention. We can go further, however, and select and examine a number of questionnaires at random to determine what cross-section of the citizens of this division of the district was actually placed in the jury wheel as prospective jurors or was excluded, but what would be better than to examine the panel of the 165 drawn for the trial of this case? The analysis made of this panel as disclosed by the charts, shows that it is fairly representative of the panels of the past, the prospective jurors whose names are in the wheel and those excluded, as to occupational analysis, and insofar as the racial analysis of it is concerned, I have discussed that above.

The list of the 165 persons who were called for service in this case shows approximately 103 occupations given by the prospective jurors on their questionnaires. (List of the occupations is set forth in the Footnote.[1]) This list, of course, does not disclose a perfect cross-section of the community by occupation,

1. List of occupations referred to.

| | |
|---|---|
| Chemist | Buyer |
| Asst. sales manager | Hardware buyer |
| Sales manager | Hardware store employee |

but it does seem to me to be a fairly liberal distribution for that number of persons. It cannot be said that those occupations do not cover people who are paid by the hour or who are paid by the day. Unions cut across many of those occupations. Who can say that if any other method were used than that which has been used, that any different result would be obtained?

The defendants' third contention is unsupported by the testimony.

What has been said completely refutes the defendants' fourth contention that they cannot have a fair and impartial trial as guaranteed by the Fifth and Sixth Amendments to the United States Constitution.

It is my conclusion that neither the clerk nor the commissioner showed any bias or prejudice in the selection of names or sources of names of prospective jurors, and that neither of them intentionally or systematically or arbi-

Bank employee
Vice president—corporation
Bank president
Secretary-Treasurer—corporation
President—corporation
Store manager
Manager
Advertising Manager
Superintendent district office
Superintendent cleaning company
Brewer
Office supervisor
Advertising specialist jobber
Press operator
Service station operator
Electric Hoist operator
Owner grocery store
Mechanic
Laborer
Waiter
Truck driver
Book binder
Printer
Bricklayer
Carpenter
Machine specialist
Air Craft Assembler
Manufacturer and Merchant
Merchant
Manufacturer
Foundry owner
Housewife
Selling & erecting memorials
Accountant
Stock broker
Investment banker
Investment broker
Instructor at Telephone Co.
Agent—insurance
Supervisor—automobile plant
Garage superintendent
Manufacturing representative
Salesman
Chemical sales
Manager, Insurance & Pension
Program for Unity Welfare, Teamsters Local 688
File supervisor
Civil Service clerk
Store clerk

Bookkeeper
Warehouse clerk
Owner, electrical appliance store
Industrial psychologist
Taxi cab operator
Asst. purchasing agent
Mine operator
Farmer & agent for oil company
Livestock dealer
Social worker
Field Investigator for hospital
Nurse's assistant
Operator employment agency
Insurance executive
Executive
Owner printing company
Owner advertising company
Owner auto agency
Auto dealer
Superintendent auto agency
Land titles
Estate Analyst
Safety director
Secretary
Real estate and insurance
Jeweler
Vault custodian
Employee department store
Tool maker
Branch manager
Florist
Representative Railroad freight dept.
Electrical appliance dealer
U.S. Post Office mail handler
Pharmacist
Gen. Manager manufacturing company
Partner—engraving company
Landlord
Civil engineer
Real Estate
Manager laundry
Retired
Unemployed
No occupation listed
Ceramic engineer
Oil jobber
Electrical communications engineer
Engineer—telephone company
Desk Clerk

trarily excluded any person or persons, or groups or classes of persons, either on account of or because of race or occupation, or for that matter for any other reason, nor does the system and method of process used by them now or for the past five years, result in such exclusion.

It follows, therefore, that the challenge to the array and motion to quash the venire and jury list, and dismiss the petit panel drawn therefrom for the trial, is denied.