**UNITED STATES of America,**
**Plaintiff,**

v.

**Joseph BRANDT et al., Defendants.**

**Crim. No. 21076.**

United States District Court
N. D. Ohio, E. D.

July 29, 1955.

See also, 139 F.Supp. 362.

Sumner Canary, U. S. Atty., Cleveland, Ohio, for the Government.

Yetta Land, Cleveland, Ohio, and Hymen Schlesinger, Pittsburgh, Pa., for defendants.

McNAMEE, District Judge.

In their motion to dismiss the indictment on the claim that the grand jury was unlawfully constituted, the defendants assert substantially the same grounds as appear in other Smith Act cases. Their grounds of attack may be summarized as follows:

1. That manual workers and Negroes were intentionally and systematically limited to a mere token representation on the jury lists.

2. That the jury officials failed to employ methods that would insure representation of a cross-section of the community on the jury lists.

No claim is or could be made that manual workers and Negroes were totally excluded from jury service in this court.

At the hearing upon the motion the defendants presented more than forty witnesses, including the clerk and commissioner. Taking the position that the defendants' evidence was not sufficient to make out a *prima facie* case, the Government presented no witnesses but was content to rely upon the testimony elicited upon cross-examination of the clerk and commissioner.

The system of selection, which has been in effect without change for a great many years, was designed to provide a fair representation of persons from nineteen counties of the Eastern Division of the Northern District of Ohio. These include highly industrialized centers such as Cleveland, Youngstown, Akron and Canton, as well as predominantly rural communities. To secure jurors from the counties outside of Cuyahoga, the clerk and commissioner send letters to postmasters, jury commissioners, mayors and other public officials and to some private individuals, requesting recommendations of names of persons possessing the qualifications of jurors. A form letter which is signed jointly by the clerk and commissioner is forwarded separately by each of them to different persons outside of Cuyahoga County who are considered to be well acquainted in their respective communities. The letter makes no reference to the type or character of persons to be recommended other than to express the desire of the jury officials to obtain "good jurors." Enclosed with the letter is a suggestion sheet which contains blank lines upon which to write the names, addresses, age and occupations of the persons recommended. At the top of the suggestion sheet appears the following:

"The following persons I consider qualified and nonexempt as jurors. (See reverse side for qualifications and exemptions)."

On the reverse side there is quoted Section 1861 of Title 28 U.S.C., defining qualifications of jurors, and Section 1862 of Title 28 U.S.C., which enumerates the classes exempt from jury service. When the suggestions of the sponsors are received by the clerk and commissioner the names received by each of them are listed upon separate sheets. From these lists the clerk and commissioner make selections of the persons by indicating their choice by blue and red marks opposite the names. While from time to time there are a few sponsors from Cuyahoga County, practically all the names of prospective jurors who reside in this county are selected by the clerk from the names of persons who have served as jurors in the Common Pleas Court of Cuyahoga County during the previous year. These selections are made from cards in the files in the office of the Cuyahoga County Jury Commissioner, which contain no information other than the names, addresses and occupations of the jurors. The Common Pleas Court obtains its jurors by selecting them according to key number from the list of registered voters of the county. From the names obtained from the Cuyahoga County jury list the clerk and commissioner again make selections by placing blue and red marks opposite the names. All the names selected by both methods are then placed on a so-called master list, and small cards bearing these names are alternately placed in the jury box by the clerk and commissioner. At the time

the clerk and commissioner make their selections they have no information as to the race, creed or color of any of the persons chosen by them and no record has even been kept of the race or religion of any juror or prospective juror. An effort is made by the clerk and commissioner to obtain a territorial representation based upon the population of the respective counties. About forty per cent of the population of the area is in Cuyahoga County.

For the purpose of impanelling a grand jury, about one hundred names are drawn from the box. Approximately forty to fifty of those whose names are drawn are excused on the grounds of illness, disability, and because jury service would be an extreme hardship. From those not excused a grand jury of 23 persons is impanelled. This occurs about once a year. On various occasions throughout the year the same system is followed in drawings of names for petit jurors in civil and criminal cases.

The Negro population in Cuyahoga County is more than ten per cent. In the eighteen counties outside of Cuyahoga, Negroes constitute about 4.3% of the population, and for the entire Eastern Division of the Northern District of Ohio the proportion of Negroes is about seven per cent. According to the defendants, the proportion of manual workers is 59%.

It will be convenient first to discuss the claim of discrimination against manual workers. As noted above, no record has been kept of the race or religion of any juror, but the occupations of the prospective jurors appear on the sponsors' lists of recommendations, and since about four years ago this information has been placed upon the index cards in the clerk's office. In support of their claim of discrimination against manual workers defendants rely in large part upon statistical tables designed to demonstrate that disproportionate representation of this class on the jury lists was the result of a conscious purpose to discriminate. These tables were not offered in evidence as exhibits and the Government was afforded no opportunity by way of cross-examination to test the accuracy of the computations or the good faith and competency of those who compiled the statistical data. However, these tables may be considered as argumentative compilations made from jury lists received in evidence which show the occupations of the jurors. The tables purport to show the proportions of manual and non-manual workers as classified by defendants on grand and petit jury panels and on the 1953 master list. This last mentioned list does not contain the names of any of the persons in the jury pool from which the members of the indicting grand jury or any of the grand juries for nine previous years were drawn. The names of the indicting grand jury were drawn from the box on September 23, 1953. It was not until some time in October, 1953 that the names of the persons on the 1953 list were placed in the jury box.

The tables submitted by defendants are inaccurate and unreliable. For example, Table VII is an analysis of the occupational status of 777 persons who were called for jury service on twenty-six petit jury panels. An examination of the typewritten lists containing these names discloses that the names of many jurors who served on more than one panel re-appear on the list several times. It is a fair estimate that instead of 777 persons of various occupations there were less than half that number of different persons who served on these panels. As a result of defendants' failure to make allowance for this repetition of names on the list, their computations of the proportions of manual and non-manual workers on the twenty-six panels present a statistical picture that is badly out of focus. These tables are based on the assumption that 59% of the working force is engaged in some form of manual labor. However, the classifications within this category are arbitrary and do not give effect to all the factors considered by the Census Bureau. Defendants' tables are unreliable for the further reason that they exclude from their compu-

tations about forty per cent of persons serving as jurors who were "housewives" or "retired men." It is a fair assumption that through marriage, housewives represent the same economic status and social outlook as their husbands and that the economic statuses and social viewpoints of "retired men" are related directly to their former employment. Yet no consideration of these factors is taken into account by the defendants. Their computations are limited to a determination of the occupational status of about sixty per cent of the jurors on the lists. However, even if defendants' computations be accepted as correct, the evidence does not establish a *prima facie* case of discrimination against manual workers. In United States v. Flynn, 2 Cir., 216 F.2d 354, 382, where the claim of discrimination was rejected, the proportions of manual workers on the three lists there referred to was in each instance less than the proportion of manuals on the lists in this court as computed by defendants. According to defendants' computations the proportion of manual workers on the indicting grand jury was 27.3%. This was not grossly disproportionate and furnishes no basis for an inference of discrimination.

Jury service is generally regarded as a burden on all who serve. This burden rests most heavily upon wage earners, whose compensation is determined by hourly rates of pay and upon manual workers generally. It is not surprising that in recognition of this fact fewer persons in this class were selected as prospective jurors. The logic of experience argues persuasively against the practice of calling large numbers of manual workers for jury duty. In his appearance before the Committee of the Judiciary of the 79th Congress, Chief Judge Knox commented upon the extreme hardship that jury service imposes upon manual workers, and said further:

"With respect to the item last-mentioned, it is easy to say that jury duty should be regarded as a patriotic service, and that all public-spirited persons should willingly sacrifice pecuniary rewards in the performance of an obligation of citizenship. With that statement I am in full accord, but it does not solve the difficulty. Adequate provision for one's family is the first consideration of most men. And if, with this thought predominant in a man's mind, he is required to perform a public service that means a default of an insurance premium, the sacrifice of a suit of clothes or the loss of his job, he will entertain feelings of resentment that will be anything but conducive to the rendition of justice. In other words, persons with a grievance against the Government or who serve under conditions that expose them to self-denial are not likely to have the spiritual contentment and mental detachment that good jurors require."

In United States v. Foster, D.C., 83 F. Supp. 197, 208, there is quoted the testimony of a union leader who, in explaining his refusal to submit a list of names for jury service, said: Our people " 'wanted to have nothing to do with juries.' "

In United States v. Dennis, 2 Cir., 183 F.2d 201, 219, the court observed:

"Jury duty is a burden to all who serve except to the relatively few who are not gainfully employed and have leisure—such as retired business men, housewives whose children have grown up, and those who welcome any break in the monotony of their lives. But the hardship which it imposes upon a manual worker, especially now that the cost of living has so much increased, is much greater than that upon 'executives' for example, who, ordinarily without serious disarrangement, can be made to serve at specified months. But all times are equally inconvenient to one who must work by the day, week or month to support a family, or even himself alone. No one who has not been charged with the duty of excusing such per-

sons knows how strong such an appeal can be."

In United States, v. Flynn, supra [216 F.2d 386], Judge Harlan, answering the defendants' contention that discrimination was evidenced by the jury officials' excusal of large numbers of manual workers on the ground of financial hardship, said:

"We agree with the District Court that this is entirely to be expected, since the financial burden of jury service obviously falls more heavily on those who are dependent for their livelihood upon a wage or salary which would be lost during absence from the job."

Defendants cite no case in which disproportionate representation of manual workers on jury lists has been equated with discrimination. Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181, upon which they so strongly rely, is not such a case. The issue decided in Thiel was that the total exclusion of wage earners by jury officials was unlawful. It is not without significance that after the Thiel decision Congress conferred authority upon district judges to exclude or excuse any group or class of persons from jury service—

"for the public interest * * * based on a finding that such jury service would entail undue hardship, extreme inconvenience or serious obstruction or delay in the fair and impartial administration of justice." Section 1863(b), Title 28 U. S.C.

No such order of exclusion was made here. It is significant, however, that Section 1863(b) reflects legislative recognition that "undue hardship" and "extreme inconvenience" are factors to be considered in selecting persons for jury service, and as experience shows, these factors are present most frequently in the case of manual workers. In discussing the object of the system of selecting jurors, Mr. Justice Frankfurter said:

"The object is to devise a system that is fairly representative of our variegated population, exacts the obligation of citizenship to share in the administration of justice *without operating too harshly upon any section of the community, and is duly regardful of the public interest in matters outside the jury system.*" Thiel v. Southern Pacific Co., 328 U. S. 217, at page 232, 66 S.Ct. at page 991. (Emphasis supplied.)

In these recent years of worldwide tension it has been imperative that the nation maintain its productive facilities at their maximum capacity. This has resulted in an extraordinary demand for the services of manual laborers. During this period the continued and uninterrupted employment of men in industry has become a matter of vital public concern and has been effective to reduce substantially the proportion of manual workers available for jury service. These are facts of common knowledge of which courts must take judicial notice. It has never been the policy of the law to conscript workers for jury service where their personal welfare would be seriously injured thereby or where competing considerations of public interest present superior claims to their services. In view of the state of the national economy during the past several years it is fairly to be assumed that the proportion of manual workers normally available for jury service has been considerably diminished. It is of course impossible to determine the extent to which such proportion has been reduced, but that it has been reduced substantially below 59% cannot be doubted.

In the light of these facts, any comparison of the proportion of manual workers called for jury service with the proportion of this group in the population is unrealistic and misleading.

In essence the defendants' argument is a plea for proportional representation of manual workers. So frequently has the Supreme Court disclaimed the necessity of proportional representation as an end in itself that citation of de-

cisions of that court upon the point is no longer necessary. As to the rejection of pleas for proportional representation in Smith Act cases, see United States v. Flynn, supra; Dennis v. United States, supra; United States v. Flynn, D.C., 103 F.Supp. 925; United States v. Frankfeld, D.C., 101 F.Supp. 449; United States v. Forrest, D.C., 118 F.Supp. 504.

The jury officials denied that they intentionally discriminated against manual workers. Their testimony must be accepted as true. Defendants have not made out a *prima facie* case of discrimination against manual workers.

Defendant's statistics show that 84% of the colored working force were engaged in some form of manual labor and that 8.6% is employed in the kindred categories of "sales" and "clerical." Defendants say in their brief:

"* * * The Negro population is almost exclusively composed of and linked with the category of manual workers."

It may therefore be assumed fairly that the same factor of hardship and the same considerations of public interest that operated to reduce the proportion of manual workers available for jury service had like effect on the proportion of available Negroes. This latter proportion, which is presumably equivalent to 7% of the population, must be discounted substantially to arrive at any fair estimate of the ratio between the proportion of Negroes available for jury service and the proportion of the members of that race on the jury lists.

Defendants make no claim that Negroes as a class were excluded from jury service, and the record is clear that throughout the years covered by the evidence colored persons were represented on the jury lists and served as jurors in this court. As noted above, the defendants' claim of racial discrimination rests solely upon an alleged intentional and systematic limitation of Negroes on the jury lists. To sustain this claim defendants rely in part upon the fact that no member of the indicting grand jury was a Negro. But their contention that this is evidence of discrimination is devoid of merit. It is well settled that an accused person is not entitled to a jury composed in part of persons who are members of his race. Nor is a jury of that kind guaranteed by the Constitution to a member of any race. Martin v. Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497; Akins v. Texas, 325 U.S. 398, 403, 65 S.Ct. 1276, 89 L.Ed. 1692; Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L. Ed. 839. This rule, which has been applied uniformly in cases where the only accused have been members of the colored race, is with greater reason and force applicable here where ten of the accused persons are white and only one is colored. To show that Negroes were not included in a particular grand jury is not enough. There must be an actual showing of a conscious and purposeful discrimination because of race, and the burden of proving such discrimination is upon the defendants. Fay v. New York, 332 U.S. 261, 295, 67 S.Ct. 1613, 91 L.Ed. 2043. The important fact to be determined in this connection is whether the jury pool from which the grand jury was drawn fairly reflected the racial composition of the community. On this critical issue the defendants submitted no evidence. The grand jury was drawn from names placed in the jury box in March, 1952 and in prior years. Evidence as to the proportion of colored persons whose names were in the box is lacking. The defendants also offered evidence showing that on the ten grand juries that served from 1945 to 1954, inclusive, (including the indicting grand jury), one Negro served on a grand jury in each of three of those years, and no Negro served as a member of the grand jury for the other seven years. Grand juries in this district usually consist of the whole number of 23 persons. Thus, of the 230 persons who served in that capacity during the ten-year period, 3, or about 1.3%, were colored. But this cannot be considered as evidence of intentional discrimination. Here again the important fact to be de-

termined is the racial composition of the jury pools from which the grand juries were drawn. There is no sworn testimony on this issue, and the only relevant data shown in a statistical table compiled by the defendants is so meager and inadequate as to furnish no acceptable evidential basis for a finding of the proportion of Negroes on the jury lists. This statistical table, which was designed to show the small number of persons summoned for grand juries from the Cedar-Central area of Cleveland as compared with the numbers of persons called from other areas, covers the five-year period from 1949 to 1953 inclusive. This is only one-half of the period during which the ten grand juries served. Like the tables submitted in connection with he issue of alleged discrimination against manual workers, this compilation was not offered as an exhibit and the Government was afforded no opportunity to cross-examine those who compiled it. Its accuracy is not vouched for by the oath of any witness. It is so deficient in other respects as to be entirely without probative value on the issue of the racial composition of the jury lists in the ten-year period in question. It is true that the heaviest and largest concentration of the colored population of Cleveland is in the Cedar-Central district where over 96% of the residents are Negroes. But not all of the colored population of Cleveland lives in this area. As shown by the evidence, other smaller areas of the city are predominantly colored in population. The evidence shows a tremendous growth in the colored population of these other districts of the city within recent years. For example, in Census Tract R-1, the colored population increased from 2.2% in 1940 to 82.9% in 1950. In the area covered by Census Tract R-2 the increase in colored population in the same period was from 4.2% in 1940 to 66.3% in 1950. There are several other areas in the city outside the Cedar-Central district where the proportions of colored population range between 24.7% and 82.4%. The evidence also indicates that there are substantial numbers of colored persons scattered throughout other districts of the city. The table does not show the number of persons called for petit jury service from the Cedar-Central district. It does not show the number of persons summoned for grand jury service from the other districts of the city that are predominantly colored in population. Nor does it disclose the number of persons called for grand juries from those areas of the city where the Negro population is substantial, and there is no evidence as to the number of colored persons in the jury pool who were residents of the eighteen counties outside of Cuyahoga. This statistical table is entitled to no weight. It represents but a sampling of a small segment of the district, and the fragmentary information it contains cannot be accepted as an index of the proportion of colored persons in the jury pool during the pertinent ten-year period. Grand and petit juries are drawn from the same box. By far the greater number are called for petit jury service. It is undeniable that Negroes were called for petit jury service and served in that capacity throughout the years in question. Yet no evidence as to the number of colored persons who were summoned for petit jury service has been submitted. This serious void in the evidence cannot be filled by argument based upon speculation and conjecture.

Except for the testimony showing the proportion of Negroes who actually served on grand juries, there is no evidence from which an inference can be drawn as to the proportion of Negroes in the total number of persons called for jury service during the ten-year period. It is a fair estimate that more than 8,000 persons were selected for jury service during this time. It cannot be seriously considered that the proportion of colored persons in this large number of jurors is reflected accurately by the proportion shown in a mere sampling of 230 names, or less than 3% of the total number called for jury service.

There is also another factor that cannot be ruled out as a possible contribut-

ing cause of the disproportionate representation of Negroes on grand juries. Grand juries in this court serve for a year or longer and the members thereof are subject to call from time to time during this period. The various times when their services are required and the length of the respective periods of service are uncertain and unpredictable. It is essential, however, that the members of the grand jury be able readily to respond to these periodical calls of the District Attorney. Few working men are able to do this, and as a consequence the proportion of manual laborers, both white and colored, who are available for service on grand juries is diminished substantially, and this, of course, tends to limit materially the proportion of Negroes generally who are available for such service.

■ Defendants also offered as witnesses twenty-eight of the sponsors of the 1953 list of jurors whose names were placed in the jury box after the indicting grand jury was drawn. This testimony was submitted on the theory that the racial and manual labor group distributions of the 1953 list would be substantially similar to those distributions on the lists of the pertinent prior years. The twenty-eight sponsors who testified were all non-residents of Cuyahoga County and represented roughly about one-third of the eighty sponsors of the 1953 list. Their testimony covered about one-third of the names on the list from outside Cuyahoga County. From their testimony it appeared that the names of 368 persons were recommended by them, of which 4% were manual laborers, and slightly less than 1% were colored. This testimony is of no aid in determining the racial composition of the 1953 list or the lists for any or all of the prior years. It was unnecessary to call sponsors to determine the proportion of manual workers on the 1953 list. This fact was readily ascertainable from the information on the index cards and the sponsors' lists of recommendations. It was from these sources that the defendants computed the proportion of manual workers on the 1953 list. Nor did the testimony of the sponsors furnish any help in determining the proportion of Negroes on the 1953 list. The principal source of Negro jurors is the Cuyahoga County Jury Commissioner's list which, as the evidence shows, contains the names of large numbers of Negro jurors. The evidence does not show the proportion of Negroes obtained from this source. There were 1650 names on the 1953 list, of which 570 were from Cuyahoga County. Manifestly, a sampling of the names submitted by the sponsors from that part of the district where the proportion of Negroes is only 4.3% affords no basis for an inference as to the proportion of Negroes on the entire list, including those from Cuyahoga County, where Negroes represent more than 10% of the population and where the names of prospective jurors are selected by the clerk from the Common Pleas jury list. The manifest inadequacy of this sampling to serve as an index of the group proportions on the list is demonstrated by its application to manual laborers. The proportion of manuals in the 368 names was 4%. The proportion of manuals on the entire list as shown by defendants' computations was approximately 20%, or almost five times greater than the proportion of manuals in the sampling. Even after the 1953 list of recommendations had been reduced by more than 600 names as a result of the final selections by the jury officials, the proportion of manuals as computed by defendants was 9.8%, or almost two and one-half times greater than the proportion shown by the sampling. Thus, instead of furnishing a reliable guide to the group proportions on the jury lists of earlier years, the sampling failed completely to reflect any reasonably close approximation of those proportions on the 1953 list itself. All the sponsors of the 1953 list were white. With but two exceptions this was true of all the sponsors for the previous seven years. In all probability all the sponsors from outside Cuyahoga County during this period were mem-

bers of the white race. That this was in no way related to a purpose to discriminate is clearly shown. Sponsors were selected solely with the purpose of securing a widespread geographical representation of jurors throughout the entire Eastern Division of the District. This is an appropriate method of obtaining a representative cross-section. The present system of selecting jurors was established more than thirty years ago when the colored population of the district was very small. The reputation of the fair-minded judges who approved the establishment of the system is adequate assurance that in its origin the system was free of the taint of any discriminatory design. The paramount objective of the system was and is to obtain a selection of jurors from the body of the district by giving representation to all the counties within the court's jurisdiction. The most expeditious and least expensive method of accomplishing this purpose is through the sponsor system. The sponsors are selected solely because they are respected and responsible citizens of the various communities in which they reside. For the most part, selections are made of persons who hold public office. The system has been continued without substantial change through the years. Today, sponsors are selected, as they always have been, without any consideration of their political, racial, or religious backgrounds. Except in rare instances, the jury officials are not acquainted with the sponsors. There is not the slightest suggestion in the evidence that the selection of sponsors was motivated by any discriminatory design. It is undisputed that the operation of the sponsor system in combination with the selection of jurors from the Cuyahoga County Jury Commissioner's lists, has resulted in the selection of colored persons as jurors throughout the years in question. It may be that because of the large increases in the Negro population in the district their representation has not been in proportion to the eligible members of that race. This may have been due in part to the failure of the jury officials to become fully informed about the extent of the increases in the Negro population in recent years. However, disproportionate representation of a class on the jury lists is not the equivalent of discrimination. If it were, few indeed would be the cases where accused persons and other litigants would not have just cause for complaint because some groups or classes were not proportionately represented as jurors. Proportional representation of all the groups in our variegated population is an unattainable ideal. As was said by Mr. Justice Reed in Cassell v. Texas, 339 U.S. 282, 286, 70 S.Ct. 629, 631.

> "Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation."

It was naturally to be expected that for the most part recommendations of white sponsors would be of persons of the same race. However, the evidence shows that some white sponsors recommended Negroes for jury service. It was made clearly to appear from the testimony of other sponsors that they would have recommended Negroes if it were not for the fact that jury service imposed too great a hardship on colored workmen. This was the reason given by many of the sponsors for the omission of Negroes from their lists of recommendations. Supplementing these general statements was the testimony of sponsor DeLisio of Louisville, Ohio, who described his efforts to secure four Negro workmen as jurors. He said he was told by all four of them that they would not serve because "they did not want to go up there and lose money." The testimony of these witnesses, like the statements of the judges and labor leader quoted above, illustrates the difficulty of securing jurors from the ranks of both white and colored working men. And it emphasizes the fact that considerations of hardship serve materially to diminish the proportions of both manual workers and colored persons who are presumably available for service as jurors. In Unit-

ed States v. Dennis, 2 Cir., 183 F.2d 201, 223, it was said that the disproportion of Negroes there shown was "adequately explained by the fact that they are among the poor groups." Similarly, the disproportion of Negroes here shown may be explained by the fact that a very large proportion of Negroes are in the manual labor group. This fact is conceded by the defendants. Indeed, it constitutes the major premise of an argument advanced by them in their brief where they say:

> "Since the Negro population is almost exclusively comprised of and linked with the category of manual workers, any substantial discrimination against manual workers inevitably results in the virtual exclusion of Negroes."

The substantial but lawful reduction of manual workers shown by the evidence is erroneously characterized in the minor premise of defendants' argument as "substantial discrimination"; but the point of their argument is that a substantial reduction in the proportion of manual workers generally unavoidably results in diminishing the Negro representation. This argument negates completely the contention that there was intentional discrimination against Negroes solely because of their race. Where a substantial reduction in manual workers on occupational or economic grounds *ipso facto* results in a limitation of Negroes on the jury lists, it cannot be true that such limitation resulted solely from racial discrimination.

> "Discrimination in this context means purposeful, systematic non-inclusion because of color." Cassell v. Texas, 339 U.S. 282, 291, 70 S.Ct. 629, 633.

Not only have the defendants failed to show such discrimination, but by their own argument they demonstrate quite convincingly that there was no racial discrimination in the selection of jurors in this court.

All of the cases cited by defendants are inapposite. In most of them the evidence shows total exclusion of Negroes, which concededly is not the case here. In Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L. Ed. 839; and Avery v. Georgia, 345 U. S. 559, 73 S.Ct. 891, 97 L.Ed. 1244, where there was disproportionate representation of Negroes, there was also evidence of discriminatory practices and techniques employed by the jury officials that clearly revealed their wrongful intent. These evasive practices find no counterpart in the evidence here. In Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692, and Brown v. Allen, 344 U.S. 443, 481–482, 73 S.Ct. 397, 97 L.Ed. 469, where limited representation of Negroes on juries was involved, the claims of discrimination were denied. In each of the last two cited cases the Supreme Court found factors in the evidence that negated intentional racial discrimination.

The jury officials denied that they discriminated against Negroes. The Government was fully justified in relying upon these sworn denials of wrongful intent. There was no conceivable motive for the jury officials to discriminate. They had no personal interest in any of the litigation in this court. It was not shown that they entertained any prejudice against Negroes. Even if the contrary were true, it is safe to assume that they would not risk the severe penalties of detection by making unjust and unlawful distinctions between members of the races in their selection of jurors. It is not without significance that almost invariably cases of racial discrimination in the selection of jurors have arisen in those regions of the country with a history of inveterate opposition to political equality for Negroes. It is fair to assume that in such cases local public sentiment approved or condoned the action of the jury officials. This is in marked contrast to the situation here. The history of the people of this district is one of devoted and sacrificial service to the cause of securing and preserving equal rights for Negroes. The predominant

public sentiment of the City of Cleveland and the entire district is militantly favorable to the continued preservation of those rights in full measure. It would be preposterous to suppose that in this climate of opinion the jury officials of this court would intentionally deny Negroes their constitutional right to serve on juries and invite the public condemnation that would be certain to follow the discovery of such action.

■ Defendants have failed to make out a case of racial discrimination. Their claim that the system does not insure a representative cross-section merits but brief comment. In Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181, the Supreme Court declared that a trial by jury "necessarily contemplates an impartial jury drawn from a cross-section of the community." And in defining the term 'cross-section' the court said:

"This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups."

It has not been shown here that there was any intentional and systematic exclusion of any of the cognizable groups enumerated by the Supreme Court.

In addition to the claims set forth in their motion the defendants attack the composition of the grand jury on various grounds of alleged irregularities. While the authorities hold that irregularities not specially pleaded need not be considered, brief reference will be made to these additional complaints.

■ The contention that one of the members of the indicting grand jury was disqualified because she was recommended for jury service by the then District Attorney, is without substance. The juror in question was fully compe-

tent to serve, and her recommendation by a Government official did not disqualify her. Cf. Ippolito v. United States, 6 Cir., 108 F.2d 668; May v. United States, 84 U.S.App.D.C. 233, 175 F.2d 994 Even if she were disqualified, there would be no warrant for dismissing the indictment. Rule 6(b) (2) of the Federal Rules of Criminal Procedure, 18 U.S.C. A., provides in part:

"(2) Motion to Dismiss. * * *

"An indictment shall not be dismissed on the ground that one or more members of the grand jury were not legally qualified if it appears from the record kept pursuant to subdivision (c) of this rule that 12 or more jurors, after deducting the number not legally qualified, concurred in finding the indictment.

The record shows that all twenty-three grand jurors concurred in voting the indictment.

■ Defendants' attack on the sponsor system as being invalid is unsupported by reason or authority. Jury officials have a wide discretion as to the manner and means of selecting names for jury service. United States v. Dennis, 2 Cir., 183 F.2d 201, 221. And it has been held specifically that the sponsor system is lawful. Walker v. United States, 8 Cir., 93 F.2d 383.

The clerk testified that pursuant to authority granted by one of the judges of this court he excused persons called for jury service who were sick or disabled and persons who had moved from the district. The clerk's testimony in this regard was:

"Q. Well, now the letters turned over to you. What happens then? Do you review the correspondence and then send them a letter, or what? A. Yes, I review—usually there is an instruction on it if it comes from the judge and that instruction is followed. If the correspondence comes to the marshal or the clerk and the reason for excuse is, I would say, illness, death, hard of hearing, moving out of the district, or something in which no discretion is neces-

sary, then I pass on it. If it is a matter of not wanting to serve because of business reasons, it is presented to the court for action.

"Q. Is that true—is that the practice followed with reference to the letters coming into the marshal's office and those coming into the clerk's office? A. That's right."

The defendants argue that in thus excusing persons for jury service the clerk unlawfully exercised a judicial function. Section 1863(a) of Title 28 U.S.C. provides:

 "A district judge for good cause may excuse or exclude from jury service any person called as a juror."

As shown by the evidence, there was no attempt by the judge to delegate his discretionary authority to the clerk. The testimony of the clerk is that he was authorized by the judge to honor written requests for excusals where it appeared clearly that the persons making the requests were incompetent to serve by reason of illness, deafness, or removal from the district. The defendants make no claim that they were prejudiced or harmed in any way by this procedure. Although they have made a painstaking examination of all such requests of prospective jurors and of the action of the clerk in connection therewith, the defendants have been unable to show a single instance where a juror was excused improperly. A strict construction of Section 1863(a) might require that a judge personally consider each and all requests of jurors to be excused from service. While the slight and harmless deviation from the prescribed procedure shown here may have been irregular, it was not a substantial error. It is a universally established rule that an indictment shall not be dismissed on the ground of irregularities in the drawing or impanelling of a grand jury, unless the moving party pleads and proves wherein and in what respect he was prejudiced. Agnew v. United States, 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624;

United States v. Parker, 3 Cir., 103 F.2d 857; Medley v. United States, 81 U.S. App.D.C. 85, 155 F.2d 857; Romney v. United States, 83 App.D.C. 150, 167 F.2d 521, 527. In United States v. Flynn, 2 Cir., 216 F.2d 354, 383–387, a court for the first time distinguished between the power of jury officials to exercise discretion in excusing persons from jury service before their names were placed in the box, and the excusing power of a judge under Section 1863, which comes into operation after jurors have been summoned for service. Prior to Flynn it was thought by so great a judge as Learned Hand that clerks might be exercising a judicial function in excusing persons from jury service on hardship grounds before their names were placed in the box. United States v. Dennis, 2 Cir., 183 F.2d 201, 219. But it was held in that case that even though the clerks were exercising a function that was exclusively judicial, there was no showing that they discriminated between classes in excusing jurors, and the court refused to dismiss the indictment. See also, United States v. Flynn, supra, 216 F.2d at page 386. In Dennis the court undoubtedly considered that if clerks exercised judicial functions in excusing persons from jury service on hardship grounds, and no prejudice resulted therefrom, the error was a harmless one and properly to be disregarded under Section 52(a) of the Federal Rules of Criminal Procedure. That Rule provides:

"Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

Here the clerk acted under the direction of the District Judge in performing duties that were largely, if not entirely, ministerial and which resulted in no prejudice to substantial rights of the defendants. There can be no doubt that Rule 52(a) governs.

Defendants' motion to dismiss the indictment on the grounds hereinabove discussed is overruled.

Defendants' challenge to the array upon the ground that there were less than

300 names of qualified persons in the jury box at the time the grand jury was drawn is considered and dealt with in a separate opinion.