**UNITED STATES of America**

v.

**Margaret Lee ROBINSON and Patricia Savarese.**

**Crim. No. N–76–63.**

United States District Court, D. Connecticut.

Oct. 15, 1976.

Michael Hartmere, Asst. U. S. Atty., New Haven, Conn., for plaintiff.

Andrew B. Bowman, Federal Public Defender, John R. Williams, New Haven, Conn., for defendants.

MEMORANDUM OF DECISION ON DEFENDANTS' OBJECTION TO GOVERNMENT'S PEREMPTORY CHALLENGES

NEWMAN, District Judge.

This case poses the troublesome issue of what limits, if any, should be imposed on a federal prosecutor's use of peremptory jury challenges when such challenges are used frequently to exclude Blacks from serving on criminal juries. The issue arises in the midst of jury selection in a case involving two defendants, one of whom is Black. The jury selection system generally used in this District is the so-called struck jury system: after challenges have been allowed for cause, the Clerk draws from the jury wheel a number of names equal to the jury of twelve plus the number of peremptory challenges allotted to the prosecution and the defendants. Sometimes, as occurred in this case, by agreement of counsel, the number drawn equals the jury of twelve, plus alternates (five in this case),[1] plus the peremptory challenges allotted to the prosecution and the defendants both with respect to the jury of twelve and the alternates. At that point each side exercises, usually on an alternating basis, its peremptory challenges.[2] Counsel notify the clerk which veniremen they wish to challenge, and the array is not

1. Normally no more than two alternates are empaneled. Five were to be empaneled in this case, since this jury was the last of several selected on one day and, with summer vacations likely to cause scheduling conflicts when the case was to have eventually been reached for trial, a larger number of alternates was agreed to by counsel.

2. While Fed.R.Crim.P. 24(c) entitles each side to a specified number of peremptory challenges to be used during the selection of alternates, separately from the selection of the jury of

informed as to how challenges have been exercised. Names not challenged are then replaced in the jury wheel, and a final drawing of names occurs, the first twelve drawn becoming the jury, and, if all challenges have been exercised, the remainder becoming the alternates in the order drawn.

In this case, following challenges for cause, the Clerk was instructed to draw 37 names, the Government having 7 peremptory challenges and the defendants having 13 to be exercised jointly. After all peremptory challenges had been exercised, the defendants objected to the Government's use of its peremptory challenges on the grounds that the prosecutor had struck all four of the Negroes eligible for the final selection. At that point the Court halted the jury selection process and instructed the Clerk to maintain a record of the 17 names available for final jury selection plus the four Negroes challenged by the prosecutor. Inquiry was made of the prosecutor as to whether he wished to put on the record any non-racial reason that had prompted his challenge of the four Negroes. He declined to respond. The matter was then continued to permit the defendants time to present a statistical analysis in support of their claim that the United States Attorney's office in this District has been excessively using peremptory challenges to strike Blacks from criminal juries, especially in cases where defendants are Black.

Subsequently, the defendants were granted permission to analyze jury selection records in the Clerk's office, and submitted data concerning the selection of juries empaneled in all criminal cases in this District during the past two years. The data show that 82 Negroes have been included in the final group eligible for jury selection, and that the prosecutors have exercised their peremptory challenges to strike 57 of these,

or an exclusion rate of 69.5%. In cases involving White defendants 49 Negroes were in the final group, and the prosecutors challenged 29, for an exclusion rate of 59.2%. In cases involving Black or Hispanic defendants, 33 Negroes were in the final group, and the prosecutors challenged 28, for an exclusion rate of 84.8%. Of the 72 trials analyzed,[3] Blacks were seated as jurors in only 13 instances, or 18.1%, and in 10 of these, only one Black juror was seated.

It appears that no federal case has rejected a federal prosecutor's use of peremptory challenges against Black veniremen. But see *United States v. McDaniels,* 379 F.Supp. 1243 (E.D.La.1974). However, ever since the Supreme Court discussed the problem in the context of state prosecutions in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the warnings for federal prosecutors have become increasingly clearer. See *United States v. Nelson,* 529 F.2d 40 (8th Cir. 1976); *United States v. Carter,* 528 F.2d 844 (8th Cir. 1975); *United States v. Pollard,* 483 F.2d 929 (8th Cir. 1973); *United States v. Carlton,* 456 F.2d 207 (5th Cir. 1972); *United States v. Pearson,* 448 F.2d 1207 (5th Cir. 1971). In *Swain,* the Court recognized the normally unquestioned right of prosecutors to exercise peremptory challenges for any reason—including a racially based preference not to have Negroes serve on a particular jury. However, the Court cautioned that extreme cases of consistent challenge of Black jurors would raise serious Fourteenth Amendment issues. The Eighth and Fifth Circuit cases cited above have emphasized that federal trial courts have supervisory power over the conduct of criminal trials to ensure that prosecutors' challenges are exercised in a fair and constitutional manner. See *United States v. Nelson, supra; United States v. Pearson, supra.*

twelve, counsel in this case agreed that peremptory challenges available to each side would be exercised in a single challenge procedure for selection of the jury and the alternates. In view of the limited number of available veniremen, the government agreed to have only one additional challenge for alternates, rather than the three to which it was entitled

under Rule 24(c), for a total of seven challenges, all to be exercised against the 37 names drawn (12 jurors, 5 alternates, 7 government challenges and 13 defendants' challenges).

3. The data submitted by the defendants analyzed 71 trials; the Court added the pertinent information from the pending case.

The nature of the claim asserted has not always been clear. Frequently the claim is asserted on behalf of the Black defendant who complains of a racially discriminatory exclusion of Blacks from the jury in his case. Yet if a peremptory challenge can be exercised for any reason (or no reason), it is hard to see why a defendant can complain if all eligible Blacks are struck from his array. *Swain* and the Court of Appeals' cases suggest that a *pattern* of exclusion would indicate that challenges are being exercised "for reasons wholly unrelated to the outcome of the particular case on trial." *Swain v. Alabama, supra,* 380 U.S. at 224, 85 S.Ct. at 838. Yet if a prosecutor thinks, whether soundly or otherwise, that Negroes may be, for any reason, more sympathetic to defendants than Whites, his consistent striking of Blacks simply indicates that he acts on this assumption regularly. If that is his assumption, his striking of Blacks in the 100th case is as related to his view of the outcome of the particular case as it was in the first case.

■ But *Swain* intimates that interests are at stake beyond those of the defendant on trial. Consistent striking of Blacks, said the Supreme Court, would indicate that "the peremptory system is being used to deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population." *Ibid.* No Black has the right to sit on any particular jury. But Blacks do have the right to participate equally with Whites in the *process* of conducting jury trials.[4] Pe-

4. To the extent that the right sought to be protected in this case is solely the right of Black citizens to participate equally in the jury process, a preliminary question of standing arises. There is no question that defendants have standing to assert their right to a jury that is selected according to non-discriminatory procedures. *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Peters v. Kiff, supra; Akins v. Texas,* 325 U.S. 398, 403–04, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945), but it is not so certain that defendants can challenge the prosecutor's conduct solely on the ground that it violates the right of Blacks in the population to equal participation in the jury process. In *Taylor* and *Peters* the Supreme Court ruled that a defendant has standing to complain of the exclusion of a class from the jury selection process even if the defendant is not a member of the class. While those decisions recognized that rights of the excluded class were implicated, see *Peters v. Kiff, supra,* 407 U.S. at 499–500, 92 S.Ct. 2163, they conferred standing upon the defendant because *his* right to due process of law had allegedly been impaired by the challenged exclusion. The interests of the class were relied upon, it appears, to give content to the defendant's due process right, not as interests that the defendant had standing to protect without regard to any rights of his own. In this case, the defendants may have some due process right of their own that is impaired by a pattern of excessive use of prosecutors' peremptory challenges against Black veniremen. But since the implication of *Swain* appears to be that such a pattern would impair only the rights of potential Black jurors, further consideration must be given to whether defendants have standing to assert these rights of third parties, wholly apart from any rights of their own.

As a general rule, a person does not have standing to assert the rights of third persons. *Tileston v. Ullman,* 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). However, "this rule has not been imposed uniformly as a firm constitutional restriction on federal court jurisdiction." *Flast v. Cohen,* 392 U.S. 83, 99, n. 20, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1967). Courts have allowed parties to assert the rights of third persons in a wide variety of circumstances. *See, e. g., Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (physician can assert the rights of his patients); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (parochial school can assert the rights of students and their parents); *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (organization can assert the rights of its members).

The Supreme Court has said that the general rule against asserting the constitutional rights of another is not part of the constitutional requirement of standing, but is a rule of self-restraint that the Court has developed for its own governance, and thus is a rule of practice not to be applied where it would be difficult if not impossible for the persons whose rights are asserted to present their grievances before any court. *Barrows v. Jackson,* 346 U.S. 249, 257, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

The reasons the Supreme Court found to compel relaxation of the stringent standing requirement in *Barrows* apply with equal force here. While Black citizens excluded from juror lists on racial grounds can litigate their exclusion, *Carter v. Jury Commission of Greene County,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d

ters v. Kiff, 407 U.S. 493, 499, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972); Strauder v. West Virginia, 100 U.S. 303, 308, 25 L.Ed. 664 (1880). See 28 U.S.C. § 1862.

At what point a pattern of using peremptory challenges to exclude Blacks denies them a fair opportunity to participate in the jury process is not subject to any automatic determination. A federal prosecutor, functioning in a district like Connecticut, where peremptories are exercised against the eligible veniremen after challenges for cause, normally has six challenges against an eligible group of 28 (12 jurors, 10 defense challenges, and 6 government challenges). See Fed.R.Crim.P. 24(b). Thus, if his challenges were exercised without regard to race, he could be expected to strike on the average 21.4% of any one race. Since Swain indicates the prosecutor can, up to some point, use challenges on the basis of race, obviously a higher benchmark must be used in determining when racial challenges have become excessive.

In Carter, on appeal from a judgment of conviction, the Eighth Circuit found an 81% exclusion rate in trials of Black defendants not excessive; however, the Court of Appeals noted that data had been presented from only 15 trials, that in 8 (53.3%) of these, Blacks were members of the jury, and that no data were presented for cases involving non-Black defendants. Moreover, the Eighth Circuit subsequently indicated that a continuation of the rate of exclusion shown in Carter could well warrant exercise of the District Court's supervisory power. United States v. Nelson, supra. In the pending case, the Black exclusion rate in trials of Black and Hispanic defendants is 84.8%, data have been presented for 32 trials of minority defendants, in only 4 (12.5%) of these trials were Blacks members of the jury, and the defendants have presented data for White defendants, which show that the exclusion rate of Black veniremen by peremptory challenge is higher in trials of minority defendants than in trials of White defendants.

■ Since the issue turns primarily on the claims of Blacks to equal participation in the jury process, assessment of the statistics presented in this case must be made against the background of data concerning the percentage of Blacks summoned for jury duty pursuant to this District's plan for jury selection. This District uses voter registration lists without any supplementary source as the reservoir from which names are randomly selected for jury service. As has previously been established, the use of voter registration lists as the exclusive source of veniremen has produced a lower percentage of Black veniremen than the percent of adult Blacks in the population. See United States v. Jenkins, 496 F.2d 57 (2d Cir. 1974), discussing percentages prevailing in the New Haven jury division. While the comparison of 3.3% Black veniremen to 5.5% adult Blacks in the three counties comprising the New Haven jury division was held not to violate Constitutional or statutory standards for jury selection, ibid., the underrepresentation of Blacks in the jury wheels of this District mandates that this Court not be reluctant to place some limits on the extent to which government peremptory challenges can further preclude Blacks from participating as jurors in criminal trials in this District.

549 (1970); Black v. Curb, 422 F.2d 656 (5th Cir. 1970), those challenging a prosecutor's excessive pattern of peremptory challenge of Black veniremen face formidable obstacles. In the first place it is unrealistic to expect a challenged venireman in a particular case to be aware that he has been challenged, much less that his challenge is the continuation of an excessive pattern. Moreover, even if a challenged Black venireman sought to determine whether he had been challenged and what pattern of Black exclusion had thereby been continued, he would be cast in the disfavored role of a volunteer juror. Plaintiffs in Carter and Black were asserting only a generalized right to be eligible for jury selection. But a Black trying to litigate a prosecutor's use of peremptory challenges would have to seek admission to the jury box in a particular case.

Under the circumstances in this case, the rationale for the stringent standing requirement, which is only a rule of practice, is outweighed by the need to protect rights that would be denied if defendants were found not to have standing to assert the rights of third persons.

The overall exclusion rate of 69.5% of Black eligible jurors by government challenges is substantial. The rate of 84.8% prevailing in cases of Black and Hispanic defendants is seriously disturbing. While the interest to be protected is primarily the right of Blacks to participate in the jury process, that right must be fully available in trials of minority as well as White defendants. It is equally disturbing that in only 18.5% of criminal trials were Blacks, normally just one, seated as jurors or alternates. As a matter of statistical probability, if twelve jurors and two alternates were selected from a universe that included 5% Blacks (the adult Black percentage in Connecticut), at least one Black would be included in the 14 jurors selected approximately 50% of the time.

The use of peremptory challenges by the prosecutors has not been solely responsible for the reduction of the percentage of trials in which at least one Black became a juror from the statistical expectation of approximately 50% to the actual figure of 18.5%. Much of the reduction is attributable to the fact that a smaller percentage of Blacks than Whites are registered to vote, thus decreasing the chances that Blacks will be members of the array summoned for jury duty.

■ The disparity between the 50% expectation and the 18.5% actuality is the context in which the present claim of excessive use of peremptory challenges against Blacks should be considered. In other words, the rate of exclusion of Black veniremen by prosecutors' challenges becomes less acceptable as the rate of Blacks serving on juries falls significantly below the statistically expected rate based on the prevailing Black adult population, even though the disparity is attributable only in part to the prosecutors' use of peremptory challenges.[5]

■ In an effort to focus on the impact solely of prosecutors' challenges on the ultimate composition of the juries, the Court has noted that there were 39 trials in which at least one Black was included in the final panel against which peremptory challenges were exercised, and, on the average, slightly more than two Blacks were included in each of these final panels. If 12 names are randomly drawn from a group of 28 that includes 2 Blacks, at least one Black would be included in the 12 approximately 68% of the time. This 68% is the expected frequency of juries that would include at least one Black out of the universe composed of final panels with the average number of Blacks that were present in the final panels in this District.[6] The data in this case

5. This assessment of the pattern of the prosecutors' peremptory challenges in the context of the reduced percentage of Blacks on the jury list is arguably at odds with language in footnote 32 of the plurality opinion in *Swain v. Alabama, supra,* 380 U.S. at 228, n. 32, 85 S.Ct. [824] at 840, n. 32 (Part III of Justice White's opinion appears to be supported by only four justices, in light of Justice Harlan's limited concurrence): "Absent a showing of purposeful exclusion of Negroes in the selection of veniremen . . . the lower proportion of Negroes on the venire list sheds no light whatsoever . . . on whether the prosecutor systematically strikes Negroes in the county. Moreover, the constitutional issue in regard to the prosecutor's systematic use of strikes against Negroes remains much the same whatever the number of Negroes on the venire list." In this case the extent to which the prosecutors have systematically struck Negro veniremen has been shown by the actual percentages of Black veniremen in the final panels who have been challenged by the prosecutors in trials of both White and minority defendants. That showing

is unaffected by the percentage of Blacks on the jury list. While I agree that the issue in regard to the prosecutors' challenges remains "much the same" regardless of the percentage of Blacks on the overall list, it is not precisely the same, and I think it is appropriate to give *some* consideration to that figure in deciding when an established pattern of exclusion of Black veniremen by prosecutors' challenges has reached a point properly to be called excessive so as to warrant corrective action, at least in the exercise of a court's supervisory power.

6. Since the prosecutors can challenge peremptorily 6 of the 28 in these final panels, the average of 2 Black jurors per final panel would be reduced to 1.57 $(2-(6/28 \times 2))$ if the prosecutors' peremptories were exercised neutrally as to race. If 12 names are drawn from a group of 22 (the initial 28 minus the 6 challenged by the prosecutor) that includes, on the average, 1.57 Blacks, the frequency with which at least one Black would be included in the 12 remains at approximately 68%.

disclose that of the 39 trials in which at least one Black was included in the final panel, the jury included at least one Black in 13 trials, or 33.3%. Thus, if only the prosecutors' peremptory challenges against veniremen in the final panels are considered, thereby eliminating the significance of the underrepresentation of Blacks in the overall jury lists, prosecutors' challenges have reduced the percentage of trials with at least one Black juror by one-half—from a statistical expectation of approximately 68% down to 33.3% (or possibly one or two percentage points higher; in four trials a defense challenge eliminated the last Black member of the final panel and there is no way of knowing whether the prosecutor would have challenged this person had the defense not done so). This disparity indicates that prosecutors' challenges alone have had a substantial impact in reducing the frequency of juries with at least one Black, and increasing the frequency of all-White juries. While this disparity is of interest, the most pertinent index of the prosecutors' use of challenges is the exclusion rate of Blacks from the final panels, *i. e.*, the percent of the Blacks in the final panels who have been peremptorily challenged by the prosecutors.

Assessing all of the data presented, I conclude that the pattern of government peremptory challenges of Black veniremen has now reached an excessive point that calls for the exercise of this Court's supervisory power over the conduct of criminal trials in this District.

■ In reaching this conclusion, I do not attribute to the prosecutors of the United States Attorney's office in this District any racist animus. An affidavit from the United States Attorney disclaims, for himself and his office, any anti-Black motivation in the challenges to Black veniremen that have occurred. Under the Supreme Court's decision in *Swain*, a federal prosecutor is entitled, in any particular case, to challenge a Black venireman for any reason at all, as long as that reason is related to his view concerning the outcome of that case. I have no doubt that in the cases analyzed for the past two years, the prosecutors honestly believed that the striking of Black veniremen would lessen the risk of bias in favor of the defendant and thereby increase the likelihood of a bias-free jury. In some instances Black veniremen may have been challenged for reasons having nothing to do with race. For example, the prosecutors may have used some peremptories to exclude veniremen with limited education and Blacks may have been disproportionately represented in the group of veniremen with limited education. However, the high rate of exclusion of Black veniremen and the fact that the rate is higher for trials of minority defendants than White defendants indicates that in a large number of instances Black veniremen were challenged because they were Black. Even in these instances, though the prosecutor's *intention* is clearly to exclude a person because he is Black, the prosecutor may have a *motivation* unrelated to any hostility toward Blacks.[7] He may simply believe that a Black juror may be somewhat partial to a Black defendant.

■ Whether having little formal education or being of the same race as a defendant correlates to any significant extent with partiality toward the defendant is far from clear, but I do not ascribe to the prosecutors any impropriety for entertaining such views, whether or not I happen to agree with them. *Swain* gives them the

---

7. This is not a case like *Davis v. Washington*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), where governmental action disproportionately affecting Blacks was held not to violate the Equal Protection Clause for lack of evidence of any intent to single out Blacks for adverse treatment. The figures disclosed in this litigation, like those in the cases distinguished in *Davis, e. g., Cassell v. Texas*, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); *Patton v. Mississippi*, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947), make it abundantly clear that the prosecutors intended to exercise their peremptory challenges disproportionately against Black veniremen and intended to do so because the veniremen were Black. Their intent is evident; it is their motivation that I am willing to assume is not grounded in racial animus.

right in any particular case to act upon such views. But *Swain* intimates, and the appellate cases already cited make clear, that when prosecutors excessively use their peremptory challenges to exclude Blacks from the process of jury trials, corrective action is warranted to make sure that the right of Blacks to participate in the citizen's role in the administration of criminal justice is not impaired. The challenges may have been legitimate in individual cases. But their cumulative effect has now reached the point where corrective action should be taken.

There remains consideration of an appropriate remedy. With respect to the pending case, it seems clear that the appropriate remedy is to disallow the challenge of the four Black veniremen and resume the jury selection process with those four names included. But it seems equally clear that some consideration must be given to a prospective remedy; otherwise every government challenge of a Black venireman risks judicial inquiry as to intent or denial of the challenge in the absence of a prosecutor's response, a course that would unduly restrict the legitimate use of peremptory challenges. Since the vice of the current practice is the *pattern* that has resulted, rather than the challenge of Blacks in a particular case, the prospective remedy should be framed in a manner that aims to lessen the pattern of Black challenges, rather than to risk changing the use of challenges in a particular case. Accordingly, the United States Attorney's office is hereby ordered to maintain a record for each criminal trial of the number of Blacks included in the final panels against which peremptory challenges are exercised and the number of Blacks challenged peremptorily by the prosecutor without explanation. It is not the purpose of this ruling to require the government to place on the record its reasons for exercising any peremptory challenge. The caveat "without explanation" is added simply to insure that the government is always free, if it so desires, to place on the record any non-racial reason it may have for challenging a Black venireman, in which event such challenges, adequately explained,[8] will not be counted in determining the ensuing pattern of Black peremptory challenges. Record should also be kept of the number of all criminal trials, the number of such trials in which at least one Black was included in the final panel, and the number of such trials in which at least one Black was empaneled as a juror or alternate. A summary report of these records shall be furnished every 90 days to this Court, with copies to the New Haven and Hartford offices of the Federal Public Defender, where they will be available for inspection by any defense counsel.

█ The resulting data will provide a basis for determining whether the pattern of exclusion of Black veniremen by government peremptory challenge over periods of time starting with the date of this Ruling will have continued at such an excessive rate that further corrective action will be warranted. If such a pattern were to continue at an excessive rate, the government would run two risks. First, peremptory challenges of Blacks might be disallowed in cases arising *after* such a pattern has been shown to have continued. Second, the validity of a conviction obtained after the date of this Ruling and *during* any future period in which such a pattern has been shown to have continued might be in jeopardy, provided the defendant in such a case objected at trial to the peremptory challenge of Black veniremen. It seems clear that no conviction already obtained and none obtained in the future could be successfully attacked because of a prosecutor's challenge of Black veniremen unless objection had been made at or before trial. See *Davis v. United States,* 411 U.S. 233, 93

---

8. There is no intention of requiring elaborate explanation in those instances where the government elects to place on the record its reasons for challenging a Black venireman. If, for example, the reason for the challenge is lack of a high school diploma, that reason will be sufficient to remove the challenge from being counted as a Black challenge in the overall pattern, assuming, of course, that the prosecutor has used his available challenges against all eligible veniremen without a high school diploma, and not just Black veniremen.

S.Ct. 1577, 36 L.Ed.2d 216 (1972); *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1962); *Leggroan v. Smith*, 498 F.2d 168, 171 (10th Cir. 1974). Under this remedy, the challenge of Black veniremen in a particular case will not forfeit any peremptory challenges nor jeopardize a conviction in that case. Only a continued pattern of Black challenges at an excessive rate will encounter the risk of those consequences.

Accordingly, it is hereby ORDERED that jury selection in the pending case will be resumed with a jury of 12 plus alternates to be drawn from the final panel as it existed on the day of defendants' objection plus the four Black veniremen challenged by the prosecutor, and that the United States Attorney's office shall submit the reports specified in this decision.

The Court wishes to express its appreciation to the Office of the Federal Public Defender and to its student intern, Mario G. Conte, Jr., of the University of Connecticut School of Law, for diligent research in the presentation of defendants' claim.